# Gilman, Son & Co. *v.* Jones.

*Trover for Conversion of Railroad Bonds.*

| 87 | 691 |
| 93 | 353 |
| 87 | 691 |
| 95 | 398 |
| 87 | 691 |
| 113 | 516 |
| 87 | 691 |
| 119 | 309 |

1. *Validity of contract; by what law determined.*—The legality of an agreement made in New York, respecting railroad bonds involved in a pending suit in Alabama, and which is to be carried into effect here, "would probably be governed by the laws of Alabama," and it is so considered in this case.

2. *Champerty and maintenance.*—The whole doctrine of maintenance, as at common law, "has been so modified in recent times as to confine it to strangers who, having no valuable interest in a suit, pragmatically interfere in it for the improper purpose of stirring up litigation and strife;" and champerty, which is a species of maintenance, "does not exist in the absence of this characteristic."

3. *Same; contract for sale of bonds in suit, purchaser agreeing to pay costs and expenses.*—A contract for the sale of negotiable railroad bonds, issued by a corporation which has become insolvent, and whose assets are being administered under a creditors' bill in equity, claims of priority being asserted by different bondholders, is not champertous, although the purchaser, who is not a party to the suit, assumes the payment of the costs and expenses incurred in the future litigation respecting the bonds, when it further appears that he was largely interested in another intersecting railroad, and was endeavoring to effect for it a lease of a part of the road of the insolvent corporation, which could not be accomplished on account of the dissent of the selling bondholder. (STONE, C. J. dissenting.)

4. *Construction of contract for sale of railroad bonds, at price dependent on contingency.*—Under a contract for the sale of certain bonds issued by an insolvent railroad corporation, which are involved in a pending suit under a creditors' bill, where claims of priority are asserted by a judgment creditor and by different bondholders; the purchaser paying $6,000 in cash, and agreeing to pay the further sum of $14,000, "provided and whenever it is finally decided in said suit, or otherwise, that said bonds are a superior lien to the other bonds of said railroad and to said judgment," but, "in case such priority of lien shall not be so finally established, then said $6,000 shall be deemed and taken as full payment;" it being finally decided that said bonds were entitled to a prior lien over the judgment and the other bonds which had been filed in the cause when the contract was made, but other bondholders, whose claims were afterwards filed, being allowed to share in this priority; *held*, that the seller was not entitled to recover the $14,000, the contingency on which it was payable not having happened.

5. *Error without injury in ruling on pleadings.*—In an action of trover, if a demurrer to a special count in case is erroneously sustained, the error is immaterial, when the record shows that the plaintiff had the full benefit of the same facts under the count in trover.

APPEAL from the City Court of Montgomery.

Tried before the Hon. THOS. M. ARRINGTON.

This action was brought by the surviving partners of the late firm of Gilman, Son & Co., against A. W. Jones and

D. S. Troy, to recover damages for the alleged conversion of fifty-eight railroad bonds; and was commenced on the 24th December, 1886. The bonds were issued by the New Orleans & Selma Railroad Company and Immigration Association, for $1,000 each, negotiable in form, as shown more particularly in the report of the case of *Morlon & Bliss v. N. O. & Selma Railway Company*, 72 Ala. 566, and 79 Ala. 595. The said corporation became insolvent, and a judgment for $17,478.20 was recovered against it by R. M. Robertson, who then filed a bill in equity in the City Court of Selma, against the corporation, T. H. Du Puy, Gilman, Sons & Co., Morton & Bliss, and several other persons, bondholders and creditors; claiming priority over the bondholders and other creditors, and asking a sale and distribution of the assets of the corporation under the decree of the court. Answers were filed by Gilman, Son & Co., Morton & Bliss, and other creditors, asserting their respective claims, and other proceedings were had, as shown by the reports of the case above referred to. On the 16th August, 1879, while said suit was pending in the lower court, Gilman, Son & Co. sold their fifty-eight bonds to said A. W. Jones, and deposited them in the hands of said D. S. Troy, to be delivered to Jones on the happening of the contingency named in the written contract of sale; and on the 28th October, 1886, after the final decision of the suit, Troy delivered them to Jones, taking from him a bond of indemnity against any claim on the part of Gilman, Son & Co.

The contract for the sale of the bonds was made in New York, was reduced to writing, and signed by Gilman, Son & Co. as parties of the first part, and by said A. W. Jones as party of the second part. It contained the following. provisions: (1.) "The parties of the first part sell, and the party of the second part purchases from them, fifty-eight bonds," describing them, "now in the possession of J. T. Holtzclaw and D. S. Troy, of Alabama, as custodians, for use in the prosecution of a suit for enforcement of, or involving the same, now pending in the City Court of Selma, Alabama." (2.) "The party of the second part purchases said bonds subject to all contingencies of the suit above referred to, except as herein specified. He pays $6,000 to the parties of the first part, upon the execution of this contract, the receipt of which is hereby acknowledged; and he agrees to pay the further sum of $14,300 to them, provided and whenever it is finally decided in said suit, or otherwise, that

said bonds are a superior lien to the other bonds of said railroad of the same issue, and also to a claim against said corporation known as the Robertson judgment; such last mentioned payment to be made in cash, whenever such final decision is made by the proper authority, and upon delivery to him also, or to his assigns, of the said bonds. In case such priority of lien shall not be so finally established, then the $6,000 already paid shall be deemed and taken as full payment for said bonds, which shall then be delivered to him without any further payment, except settlement of all legal expenses hereby assumed by him." (3.) "It is understood that an arrangement already exists with said attorneys, by which the said parties of the first part are to pay them a further sum of $250, and which they hereby also agree to pay; and by which said attorneys are to receive five per cent. commissions, in case they do not succeed in establishing such priority, or ten per cent. commissions in case they do succeed therein; and the party of the second part hereby agrees to settle with said attorneys, including all their fees and legal expenses incurred and to be incurred, except said sum of $250 to be paid by the parties of the first part." (4.) "The parties of the first part agree and consent that the suit or suits now pending may be carried on in their names until final termination; but said party of the second part is to arrange with said attorneys and counsel, so as to exonerate said parties of the first part from all further legal liability, except as aforesaid, by assuming their position with said attorneys in that respect; but the party of the second part is to have the control and direction of the said suit or suits, subject only to the right of the parties of the first part to employ additional counsel at their own expense, if they shall see fit to do so, in their own interest." (5.) "The parties of the first part, if requested by the party of the second part, will give instructions to the counsel employed, to apply for the appointment of the receiver of the property of said corporation, as the party of the second part may desire, or agree to a lease of the same on like request, and will also do, in and about said suit, on his request, and at his expense, all and whatsoever he may reasonably request them to do, in accordance with this agreement, for the purpose of making the sale [same?] more effectual, or more advantageous to said party of the second part." (6.) "A copy of this agreement shall be deposited with said D. S, Troy, in trust, with a request that he assent to its terms, and agree to hold

[Gilman, Son & Co. v. Jones.]

the said bonds in trust for the respective parties hereto, subject to the present agreement, and to be disposed of as herein expressed. In witness whereof," &c.

The original complaint contained only a count in trover for the conversion of the bonds, but two special counts in case were added by amendment, each of which set out the written contract, and claimed damages because Troy delivered the bonds to Jones in violation of its terms, and without payment to plaintiff of the $14,300, as stipulated therein. The court sustained a demurrer to the first special count, and this ruling is here assigned as error; but it is not necessary to set out that count in full, since this court does not consider its legal sufficiency. The defendants pleaded not guilty, and a special plea alleging that the bonds were delivered to Jones, after the termination of the suit, in strict compliance with the terms of the contract; and issue was joined on these pleas. On the trial, the plaintiffs offered in evidence the written contract, and the final decree of the City Court of Selma, in accordance with the last decision of this court, as shown by the report in 79 Ala. 590. By the terms of this decree, as shown more fully by the report of the case, it was held that Gilman, Son & Co. were entitled, as *bona fide* holders for value, to a priority of lien over the Robertson judgment, and over the claims of Morton & Bliss and other bondholders; but it was further held that Seligman & Co., of New York, as the holders of forty-seven bonds, which they had taken as collateral security for a debt which, with interest, amounted to about $30,000, and which they had not filed in said court until after the rendition of the first decree, were also *bona fide* holders for value to the amount of their secured debt, and entitled to share in the assets on terms of equality with Gilman, Son & Co. The correspondence between the parties, prior to the contract for the sale of the bonds, was in evidence; and also several letters written by plaintiffs to Troy after the final decision of the case by this court, claiming that the decision was in their favor, and forbidding him to deliver the bonds to Jones without payment of the $14,300. Jones testified on behalf of the defendants, as to the circumstances connected with his purchase of the bonds, having gone to New York for that purpose on the invitation of the plaintiffs; and stated that he made the purchase in the interest of the owners of the Selma & Greensboro railroad (he being one of them), which intersected the New Orleans & Selma road at Eliza-

[Gilman, Son & Co. v. Jones.]

beth Station, for the purpose of effecting a lease of the latter road between that point and Selma, thereby saving annually abont $20,000 to their own road; the plaintiffs, as bondholders, having refused to sanction such lease pending the suit.

On all the evidence, of which the above is the substance, the court charged the jury, on request, that they must find for the defendants, if they believed the evidence. The plaintiffs excepted to this charge, and they here assign it as error.

BRICKELL, SEMPLE & GUNTER, for appellant.—(1.) The contract for the sale of the bonds is to be tested, not by the law of New York, where it was entered into, but by the law of Alabama, where the suit was pending, and where performance was to be had.—*Grell v. Levy*, 16 C. B. Rep. 73; *Richardson v. Rowland*, 40 Conn. 572; *Kentucky v. Bassford*, 6 Hill, N. Y. 526; Greenhood on Public Policy, 398; *U. S. Bank v. Daniels*, 12 Peters, 54; 1 How. U. S. 169. (2.) Under the laws of Alabama, as declared by repeated decisions of this court, the contract was void for champerty, because the purchaser was not a party to the suit, and because he assumed the payment of the costs.—*Holloway v. Low*, 7 Porter, 88; *Dexter v. Nelson*, 6 Ala. 68; *Elliott v. McClelland*, 17 Ala. 209; *Dumas v. Smith*, 17 Ala. 305; *Poe v. Davis*, 29 Ala. 676; *Ware v. Russell*, 70 Ala. 174; *Thompson v. Marshall*, 36 Ala. 512. These decisions recognize the doctrine of champerty, and show how far it has been relaxed by modern decisions, or affected by statutory provisions. See, also, *Prosser v. Edmunds*, 1 Y. & C. 484; 2 Story's Equity, § 1040, note *G*; 6 Hill, N. Y. 526; 2 My. & K. 140; White & Tudor's L. C. Eq., vol. 2, pp. 1632-39. (3.) Even if the contract be held free from the taint of champerty, Jones was not entitled to the possession of the bonds until he paid the $14,300, additional to the cash payment. By the terms of the decision, a superior lien for the whole amount of their bonds was declared in favor of Gilman, Son & Co., and no one was given a priority over them; and though Seligman & Co. were allowed to prove, for a part of their debt, on equal terms with them, it must be noted that they were not parties to the suit when this contract was made, and it is to be presumed that the parties contracted in reference to its *status* at that time. Suppose Jones had realized the full amount of these bonds out of the assets, could he have refused to pay the $14,300?

[Gilman, Son & Co. v. Jones.]

E. W. PETTUS, and T. B. ROY, *contra.*—(1.) By the laws of New York, where this contract was made, both parties being there, and where it was executed (for the payment of the $6,000 was all the purchaser had to do), its validity can not be questioned.—*Sedgwick v. Stanton,* 4 Kernan, 301; *Peck v. Briggs,* 3 Denio, 107; *Mott v. Small,* 20 Wend. 212; *Coughlan v. Railroad Co.,* 71 N. Y. 443. The whole doctrine of champerty, as it existed at common law, has been greatly relaxed by modern judicial decisions, both in this country and in England, and modified by statutory provisions. Story' Equity, § 1050; § Benj. Sales, 705-6; *Williams v. Prothers,* 5 Bing. 309; 2 Ap. Cases, 186; *Fender v. Parker,* 11 Mees. & W. 675; *McPherson v. Cox,* 96 U. S. 404. The essence of champerty is the unlawful intention of fomenting litigation, and it does not exist where the purchaser has, or honestly thinks he has, an interest in the pending suit, whether in its conduct, its result, or its subject-matter. *Vaughan v. Marable,* 64 Ala. 61-7; *Johnston v. Smith,* 70 Ala. 108; *Thompson v. Marshall,* 36 Ala. 512; *McCall v. Capehart,* 20 Ala. 526; *Ware v. Russell,* 70 Ala. 179; *Price v. Carney,* 75 Ala. 546; *Broughton v. Mitchell,* 64 Ala. 210; *Insurance Co. v. Tunstall,* 72 Ala. 142. At common law, a *chose* in action was not assignable, and this was the chief foundation of the law against champerty; but, in Alabama, by statutory provisions long of force, any *chose* in action is assignable, and. the assignor had a right to sue in the name of the assignor, on giving indemnity for costs, before he was allowed to sue in his own name.—*Brazier v. Tarver,* 4 Ala. 569; Code, §§ 1762, 2594, 2601. *Choses* in action on which suits are pending, are not excepted from the operation of the statute, and are clearly within its spirit and policy. Railroad bonds, such as these, are negotiable instruments, and are so made on principles of public policy. A pending suit does not destroy their negotiability.—*Winston v. Westfeldt,* 22 Ala. 760. The defendant's interest in the subject-matter of the suit is clearly shown by the evidence. (5.) The contract has been executed, and its validity can not now be assailed.—*Taylor v. Bowers,* 1 Q. B. D. 291; 103 U. S. 59; *Black v. Oliver,* 1 Ala. 450; 2 Benj. Sales, 680. (3.) Under the terms of the decision, the $14,300 never became payable.

SOMERVILLE, J.—The action is one of *trover* brought by the appellants against the appellees, for the alleged con-

[Gilman, Son & Co. v. Jones.]

version of fifty-eight bonds, of one thousand dollars each, issued by the New Orleans & Selma Railroad Company. There are also two counts added by way of amendment, in *case*, based on the alleged unlawful use of the bonds, and of the decree of the Chancery Court in which they were merged.

The main point of controversy in the case is, whether the contract of August 16, 1879, between the plaintiffs, Gilman, Son & Co., on one side, and the defendants, A. W. Jones and D. S. Troy, as trustee, on the other, is void for *champerty*. Under this agreement, which was made in the State of New York, Jones purchased from the plaintiffs these bonds, for which a suit, by cross-bill, was then pending in the City Court of Selma, Alabama, sitting in equity.—*Morton v. N. O. & S. R. R. Co.*, 79 Ala. 590. They were to be held in trust by the defendant Troy, who then had custody of them as an attorney of the appellants, and were not to be delivered until the termination of the suit, and the payment of the agreed price. The litigation was to be continued in the name of the sellers, and the purchaser was to pay the attorney's fees, and "legal expenses incurred and to be incurred," except a retainer fee of two hundred and fifty dollars due by the present plaintiffs to their attorneys in that suit.

It is shown that in the State of New York, where this contract was entered into, there was no law of champerty which would render it illegal. The contract, consequently, was legal, when tested by the law of that State.—*Sedgwick v. Stanton*, 14 N. Y. 289; *Thallhimer v. Brinkerhoff*, 3 Cow. 623; s. c., 15 Amer. Dec. 308. But, as the agreement of the parties was to be carried into effect in the State of Alabama, where the suit was pending, the question of its legality would probably be governed by the laws of the latter State, according to the authorities, and we shall so consider it. 1 Addison, Contr. (Amer. Ed., Morgan), § 257, p. 391; *Grell v. Levy*, 16 C. B. (N. S.) 73; *Richard v. Rowland*, 40 Conn. 565.

Champerty is a species of maintenance, which at common law was an indictable offense. Maintenance was an officious intermeddling in a lawsuit by a mere stranger without profit. Champerty involved the element of compensation for such unlawful interference, by bargain for part of the matter in suit, or some profit growing out of it, or, according to some of the authors, as well also for the whole of the thing in dispute.—1 Hawk. P. C. 462-463; 3 Amer. & Eng. Encyc.

Law, 68–69; *Holloway v. Lowe*, 7 Port. 488; *Poe v. Davis*, 29 Ala. 683; *Ware v. Russell*, 70 Ala. 174. It would accomplish no good to quote at length the numberless definitions of these offenses given in the old books. Sir James Stephen, in his Digest of Criminal Law (note VIII), alludes to the vagueness with which these crimes are defined by the ancient common-law writers, and discusses the reasons why they have long since become obsolete. The ground of their origin is found in the familiar principle stated by Lord Coke: "Nothing," he says, "in action, entry or re-entry, can be granted over; for so, under color thereof, pretended titles might be granted to great men, whereby right might be trodden down, and the weak oppressed."—Co. Lit. 114a. It was a part of the law of maintenance, that no *chose in action*, which included all rights not reduced to possession, could be assigned or transferred. This was on the ground, as said by Mr. Chitty, that "such alienations tended to increase maintenance and litigation, and afforded means to powerful men to purchase rights of action, and thereby enable them to oppress indigent debtors, whose original creditors would not perhaps have sued them."—Chitty on Bills, *6-*7. It is common knowledge, however, that this rule, refusing to sanction, or give effect to the assignment of *choses* in action, was never adopted by courts of equity, either in England or in this country, and that courts of law, yielding to the growing exactions of commerce, finally allowed the assignees of such rights to maintain suits in the name of their assignors. 2 Story's Eq. Jur. § 1050. Such assignments are now expressly authorized by the statutes of this State.—Code, 1886, §§ 1762-63, 2594.

The peculiar state of society, out of which such a law grew, carried it to the most absurd extremes. Men were held indictable for aiding a litigant to find a lawyer; for giving friendly advice to a neighbor, as to his legal rights; for lending money to a friend, to vindicate his known legal rights; for offering voluntarily to testify in a pending suit, and other like offices of charity and friendship.—3 Amer. & Eng. Encyc. Law, 71. It is not surprising, therefore, that the law on this subject has gradually undergone a great change, which is recognized universally by jurists, judges and law-writers everywhere. This change has been called for by the new conditions of modern society, considered in its varied relations, commercial, political, and sociological. In many of its phases, it has been, both in America and

England, emphatically discarded, as "inapplicable to the present condition of society, and obsolete."—*Sedgwick v. Stanton*, 14 N. Y. 289, 296; *Masters v. Miller*, 4 Term R. 320; *Thallhimer v, Brinckerhoff*, 3 Cow. 623; s. c., 15 Amer. Dec. 308; *Richardson v. Rowland*, 40 Conn. 565; 2 Whart. Cr. L. (8th Ed.), § 1854, note. It is accordingly asserted, on high English authority, that no one has been punished criminally for the offense of maintenance or champerty within the memory of living man.—3 Stephen's Hist. Crim. Law, 234. Public opinion in England has advanced so far on this subject, that the Criminal Law Commissioners many years ago recommended very earnestly that the offenses of maintenance and champerty be abolished, observing of them, that they "are relics of an age when courts of justice were liable to intimidation by the rich and powerful and their dependents."—Stephen's Dig. Crim. Law, *note* VIII.

There is much reason, it thus seems, for the relaxation of the old doctrines pertaining to the subject, so that they may be adapted to the new order of things in the present highly progressive and commercial age. Necessity and justice have, accordingly, forced the establishment of recognized exceptions to the doctrine of these offenses. Among these may be enumerated the following instances: Relationship by blood or marriage will often now justify parties in giving each other assistance in law suits; and the relation of attorney and client; or the extension of charitable aid to the poor and oppressed litigant; and especially is an interference in a law suit excusable, when it is by one who has, or honestly believes he has, *a valuable interest* in its prosecution. It is especially with the last mentioned exception we are concerned in the present case, which, in our judgment, is controlled by it.

The principle is thus generally stated in 3 Amer. & Eng. Encyc. Law. p. 76: "It has been seen that the *gist* of the offense of maintenance is, that the interference is *officious;* where, therefore, a party either has, or honestly believes he has, *an interest*, either in the subject-matter of the litigation, or in the question to be determined, he may assist in the prosecution or defense of the suit, either by furnishing counsel, or contributing to the expenses, and may, in order to strengthen his position, purchase the interest of another party in addition to his own. The interest may be either small or great, certain or uncertain, vested or contingent; but it is essential that it be distinct from what he may ac-

quire from the party maintained." In *Thompson v. Marshall*, 36 Ala. 504; s. c., 76 Amer. Dec. 328, this principle was applied to a case where one co-defendant, in a suit pending to rescind a conveyance for fraud, purchased the interest of his co-defendant in the property in litigation, and assumed a liability for his vendor's share of the costs and expenses of suit. The contract of purchase was held not to be champertous, because the interference was to protect a valuable interest, and was not, therefore, either an unlawful or officious intermeddling. So, in *McCall v. Capehart*, 20 Ala. 521, where certain persons, erroneously believing that they had an interest in a piece of land then in litigation, purchased the interest of the defendant, and indemnified him against the costs and damages of suit, the court held the transaction free from the taint of champerty, on the ground that the assistance was rendered by the defendants "under the honest belief that they were interested in the result of the suit, and not for the purpose of fomenting litigation."

The modern and better definitions of champerty incorporate this idea fully. Mr. Wharton says: "Maintenance is support given to a litigant in any legal proceeding in which the person giving the assistance *has no valuable interest*, or in which he assists for an improper motive."—2 Whart. Crim. Law. (9th Ed.), § 1854. In 2 Bouvier's Law Dict. (14th Ed.) 90, it is defined to be "a malicious, or at least officious interference, in a suit in which the offender *has no interest*, to assist one of the parties to it against the other with money or advice to prosecute or defend the action, without any authority of law." So, Mr. Addison involves in the definition the idea of agreeing to assist in the prosecution of a law suit, "in which the party making the agreement is *in no wise interested*, and with which he has no just or reasonable ground for interference."—1 Add. Contr. 256. Of course, it is necessarily true that, if the offense in question does not amount to maintenance, there can be no champerty in it, because, as we have said, champerty is but a species of maintenance.—2 Co. Inst. 207.

In *Thallhimer v. Brinckerhoff*, 3 Cow. 623; s. c., 15 Amer. Dec. 308, 314, a leading and learned case on the subject of champerty, it is said, "that any interest whatever in the subject of the suit is sufficient to exempt him who gives aid to the suitor from the charge of illegal assistance." And referring to such interferences, it is said: "Upon all such cases these laws were never intended to operate. They

were intended to prevent the interference of strangers having no pretense of right to the subject-matter of the suit, and standing in no relation of duty to the suitor. They were intended to prevent traffic in doubtful claims, and to operate upon buyers of pretended rights, who had no relation to the suitor, or the subject, than as purchaser of the profits of litigations." In *Ware v. Russell*, 70 Ala. 174; s. c., 45 Amer. Rep. 82, this court sustained an agreement between .attorney and client, as free from champerty or maintenance, where the defendant in attachment, in consideration of professional services on the part of the assignee, assigned to his attorney the entire property in litigation, giving him the entire management and control of the suit, and stipulating for his own, the assignor's, active prosecution of it. It was said by BRICKELL, C. J.: "The corrupting element of the contract [of champerty] is its tendency to foment or protract litigation, its dependency for its value upon the termination of suits, and its introduction, to control and manage them, of parties *without other right or interest* than such as is derived from the contract." In *Call v. Calcff*, 13 Met. 362, where two persons owned distinct rights to the exclusive use of a patent in two different places, near each other, it was held, that the interest which each had in maintaining the value and profit of his particular right would justify him in aiding the other to prosecute a suit for the infringement of the exclusive right of the latter. So it has been held, and is manifest, that any citizen may lawfully contribute to the lawful expenses of any public criminal prosecution, and the act will not subject him to the charge of maintenance. *Com. v. Dupuy*, Brightly (Pa.) 44. See, also, Story on Contr. § 579; Parsons Contr. *765-*766; 2 Story's Eq. Jur. § 1050.

We may safely say that the whole doctrine of maintenance has been modified in recent times, so as to confine it to strangers who, having no valuable interest in a suit, pragmatically interfere in it for the improper purpose of stirring up litigation and strife. And champerty, which is a species of maintenance attended with a bargain for a part or the whole of the thing in dispute, does not exist in the absence of this characteristic of maintenance. If the pecuniary interest of a person, even though he own no part of the immediate subject-matter of the suit, be so connected with it collaterally in any way as to be diminished or increased in value by the result of such suit, we can perceive no principle of public

[Gilman, Son & Co. v. Jones.]

policy that ought to forbid such person from taking proper care that such interest shall be properly protected in the courts. The forfeiture of the charter of a railroad, for example, on the line of which the owner of a factory or rolling-mill may have his plant, might result in his financial ruin; could it be said, in the light of modern views on this subject, that an agreement to aid in preventing the forfeiture would be champertous, and as such criminal, because the mill-owner held no stock in the railroad company, nor was otherwise immediately interested in the corporate charter or property? Interference in law suits, it has been said, to savor of maintenance, "must have some tendency to pervert the cause of justice" (*Stanley v. Jones*, 7 Bing. 369), or else, as said by Blackstone, "to pervert the remedial process of the law into an engine of oppression."—4 Bla. Com. 135. These elements of unlawfulness are entirely wanting in the supposed case.

Mr. Story asserts, that one "may purchase by assignment the whole interest of another in a contract or security, or other property, which is in litigation, provided there is nothing in the contract which savors of maintenance—that is, provided he does not undertake to pay any costs, or make any advance *beyond* the mere support of the exclusive interest which he has so acquired." And he puts his conclusion upon the ground, that a court of equity would, without special contract, *compel* the assignor to permit his name to be used in the suit, on the assignee's giving him indemnity for such costs. "Such indemnity, and such proceedings, under such circumstances," he adds, "are not deemed maintenance."—2 Story's Eq. Jur. § 1050. This seems to be the more correct and logical view, and better comports with the necessities of modern commerce, except as to transactions between client and attorney, which, by reason of their peculiar relations, ought perhaps to stand on a different basis from other contracts savoring of a maintenous character. *Ware v. Russell*, 70 Ala. 174; s. c., 45 Amer. Rep. 82; *Elliott v. McClelland*, 17 Ala. 206. Although, by the great weight of modern authority, contingent fees of a legitimate character charged for professional services, dependent on the amount of recovery, are not deemed within the rules against champerty and maintenance.—*Thallhimer v. Brinckerhoff*, 15 Amer. Dec. 321, *note*, and cases cited; *Stanton v. Embrey*, 93 U. S. 548; *Blaisdell v. Ahern*, 144 Mass. 393; s. c., 59 Amer. Rep. 99; *Walker v. Cuthbert*, 10 Ala. 213, 219.

[Gilman, Son & Co. v. Jones.]

But we prefer to place our decision in this case upon the broad ground, that the interest possessed by the defendant Jones in the pending suit, involving the fate of the Selma & New Orleans, Railroad, was sufficient to rescue this transaction from the element of officious intermeddling, or pragmatical interference on his part. He and his associates owned another railroad, called the Selma & Greensboro Railroad, which was in operation between Akron and Marion Junction. The bed of the road extended from the latter point to Elizabeth Station, a point on the New Orleans & Selma road; and on this portion of the track, iron had formerly been laid, but was removed by the Confederate Government during the late war. The owners of the Selma & Greensboro road had no access to Selma, except over the track of the Alabama Central Railroad, and at a very heavy expense, by way of rental compensation. To avoid this expense, and thus appreciate the value and increase the profits of their road, they formed the plan of leasing or buying the Selma & New Orleans road, so as to connect with it at Elizabeth Station, and have an open route of their own to Selma. Negotiations were opened with the trustee of the litigant bond-holders, and the bond-holders themselves, all of whom except Gilman, Son & Co., the plaintiffs in this suit, gave their consent to have such lease to be legalized by approval. of the Chancery Court in which the suit was pending. These particular bonds were purchased, and the agreement of August 16th, 1879, entered into, in order to consummate this enterprise. As stated by the record, the purpose of Jones was to enable him and his associates "to obtain the use of the New Orleans & Selma Railroad, to run their cars over from Elizabeth Station to Selma; and, soon after such purchase, the proposed lease was made with the approval of the court, and the Selma & Greensboro road was put in order and ironed afresh to Elizabeth Station, and used by it to run their cars to the latter point, and thence on the said New Orleans & Selma Railroad into Selma." It is argued by counsel, with much reason, that the interest which the purchasers had in the Selma & New Orleans road—the one in litigation—was emphasized by the existing right of the Selma & Greensboro road "to intersect, connect with, or cross" the former road at any point, and the duty of each road to receive and transport the cars of the other without delay or discrimination, as guaranteed by law.—Const. 1875, Art. XIV, § 21; A. G. S. R. R. Co. v. S. & N. R. R. Co., 84 Ala.

570.   We hold that these facts relieved the contract in question of all taint of champerty, irrespective of other considerations which we do not propose to discuss.

There are other grounds, which, in our opinion, would justify the conclusion reached by the City Court adverse to the plaintiffs, but we need not consider them.

The action of the court in sustaining the demurrer to the second count of the complaint becomes immaterial, in view of the fact that the plaintiff, in the trial of the cause, had the full benefit of the issues raised under that count, under the first count.

On the remaining point, we entertain no doubt. This involves the right of the plaintiffs to recover the further sum of $14,300.00, additional to the cash installment of $6,000, already paid. This sum was made payable by the terms of the contract only contingently, "whenever it is finally decided in said suit, or otherwise, that said bonds are a *superior* lien to the other bonds of said Railroad and Immigration Company of the same issue," and to what was known as the Robertson judgment, which was the basis of said chancery suit. "Superior" means higher in dignity, quality, or excellency.—Worcester's Dict. Here it manifestly means *prior*—superior lien meaning prior lien. This is made clearer, if possible, by a subsequent provision in the contract itself, that "in case such *priority* of lien shall not be finally established," then the six thousand dollars already paid shall be deemed full payment, without any further payment, except settlement of the legal expenses assumed by Jones. This, moreover, was the main question in controversy in the case to which the agreement had reference, the proceedings in which are made a part of the present record.—*Morton v. N. O. & S. Railway Co.*, 79 Ala. 590. The bonds of Gilman, Son & Co. were not decided to be a superior lien to all other bonds of the same issue. The record shows that an equal priority was accorded by the decree of this court to forty-seven other bonds held by Seligman & Co., as collateral security, for which they were allowed to prove on terms of perfect equality with Gilman, Son & Co., as *bona fide* holders without notice of any infirmity of title in them. This fact is fatal to the contention of appellants on this particular point.

We discover no error in the judgment of the City Court, either in sustaining the demurrer of appellees to the second count of the complaint, or in the charge given the jury, to find for the defendants if they believed the evidence.

Affirmed.

[Cofer v. Moore.]

STONE, C. J., dissenting.—I do not think Jones shows such an interest in the litigation, or subject-matter of the suit, as relieves him of the imputation of maintenance. To have that effect, I hold that he must have had a pecuniary, or property interest. Mere benefit, or assistance to some other independent enterprise he was prosecuting, is not enough. Few, if any, contracts would be made, if the contracting parties did not each believe they were thereby securing to themselves some profit, benefit, or pleasure.