**Achilles PAPPAS et al., Appellants,**

v.

**EASTERN SAVINGS BANK, FSB, et al., Appellees.**

No. 05–CV–1062.

District of Columbia Court of Appeals.

Argued Oct. 25, 2006.
Decided Dec. 7, 2006.

Daniel S. Roth, Washington, DC, with whom Kurt Berlin, was on the brief, for appellants.

G. Vann Canada, Jr., Rockville, MD, for appellees.

Before FISHER and THOMPSON, Associate Judges, and NEWMAN, Senior Judge.

THOMPSON, Associate Judge:

This case is the continuation of a dispute that arose several years ago between lienholders of a property located at 2507 33rd Street, S.E. ("the 33rd Street property"). Appellants, who obtained judgment liens against the 33rd Street property to satisfy

certain debts, complain that their liens were not satisfied from the proceeds of a foreclosure sale of the property conducted at the instance of appellee/mortgagee Eastern Savings Bank ("ESB"), and ask that the sale be set aside. The trial court granted summary judgment in favor of ESB. We affirm.

## I. Background

The early history of this dispute is set out in *Eastern Savings Bank, FSB v. Pappas*, 829 A.2d 953 (D.C.2003) ("*Pappas I*"). We borrow liberally from that description.

In 1980, Aphrodite Pappas, who was the owner of the 33rd Street property, conveyed the property to Vasiliki Pappas in fee simple. Soon thereafter, Aphrodite Pappas died, leaving her three children as heirs.[1] Vasiliki Pappas was named personal representative of the Aphrodite Pappas estate. In 1986, however, the Probate Court removed Vasiliki Pappas as personal representative because of numerous improprieties with respect to her fiduciary responsibilities.

On April 18, 1990, Vasiliki Pappas executed a deed of trust on the 33rd Street property to secure a loan made to her by CitiBank Federal Savings Bank ("Citi-Bank") in the amount of $159,000, which deed of trust was recorded at about the same time. In 1992, and again in 1996, the successor personal representative of the Aphrodite Pappas estate obtained judgments against Vasiliki Pappas personally for breach of fiduciary duty. These judgments, too, were duly recorded in the land records, and they became effective as judgment liens against all real property titled in the name of Vasiliki Pappas, including the 33rd Street property. The

record discloses that the total value of those liens is in excess of $240,000. In March 1999, the Probate Court ordered that portions of the judgments obtained by the successor personal representative of the Aphrodite Pappas estate be distributed to the beneficiaries, the Pappas heirs.[2]

By 1998, Vasiliki Pappas was in default on the CitiBank deed of trust, and Citi-Bank instituted foreclosure proceeding. In November 1998, Vasiliki Pappas secured a loan from ESB and executed a promissory note in the amount of $ 168,000 payable to ESB, $153,800 of which was used to refinance and discharge the earlier CitiBank loan. This note was secured by a new deed of trust with respect to the 33rd Street property, which was recorded on November 6, 1998. The CitiBank deed of trust was released by an instrument dated September 15, 1999, and recorded January 15, 2000. The interest rate on CitiBank's promissory note had been approximately 10.5%; the rate on ESB's note was 14.25%.

Soon after executing the promissory note and deed of trust in favor of ESB, Vasiliki Pappas defaulted on the ESB loan. ESB prepared to foreclose. In connection with that preparation, counsel for ESB caused the title to be examined, and ESB learned for the first time that there were judgments in favor of the Pappas heirs against Vasiliki Pappas individually and also learned the amount of the total judgment debt. The record discloses that on February 4, 2000, a lawyer for the estate of Frances Papageorge (one of the Pappas heirs), wrote to ESB's counsel about ESB's foreclosure sale notice published sometime prior to that date, noting that the foreclosure sale was being delayed be-

---

**1.** The heirs were Achilles Pappas, Mary Pappas West and the late Frances Papageorge. Appellants here are the same Achilles Pappas and Mary Pappas West, and Christy Papageorge, as personal representative of the estate

of Frances Papageorge (together, the "Pappas heirs" or "the Pappas appellants").

**2.** The record does not indicate whether the fact of that distribution was recorded in the land records.

cause of Vasiliki Pappas' bankruptcy petition and inquiring about how ESB would handle the judgment liens.

On December 19, 2000, ESB brought a suit for declaratory relief against the Pappas heirs in their individual names, claiming that its lien had priority over the heirs' judgment liens under the principle of equitable subrogation. The trial court held that the heirs' liens, which were recorded first, were first in right, but this court reversed, holding that ESB, having paid CitiBank to satisfy Vasiliki Pappas' indebtedness to CitiBank, had the superior lien by virtue of the doctrine of equitable subrogation. *See Pappas I*, 829 A.2d at 960.[3] We remanded the case to the trial court to determine "whether, and to what extent, [ESB] is entitled to equitable subrogation for *interest* on the $153,800 it paid CitiBank to release CitiBank's Deed of Trust." *Id.* at 960 n. 13 (emphasis in the original). The trial court eventually determined, by order dated January 27, 2005, that ESB's superior lien was to the extent of the original $153,800 indebtedness plus interest at 10.5%, for a total of $181,100.71.

In the meantime—while *Pappas I* was pending in the trial court, and before the appeal to this court and the resultant remand—ESB proceeded with foreclosure against the 33rd Street property. The foreclosure notice was sent to Vasiliki Pappas on March 16, 2001. Notice was also sent on that date to the (former) personal representative of the closed Aphrodite Pappas estate (which was the record holder of the 1992 and 1996 judgment liens). No notice was sent to the individual Pappas heirs. Notice of the foreclosure was published in the newspaper beginning on March 23, 2001. On April 3, 2001, the property's substitute trustees (co-appellees here) sold the property to ESB, the high bidder at the sale, for $171,000—an amount that, in light of the trial court's determination about the extent of ESB's superior lien, turned out to be less than the amount of the superior lien and insufficient to cover any portion of the Pappas heirs' subordinate judgment liens.[4]

On June 19, 2001, the Pappas heirs filed suit (a "creditors' bill") in the Superior Court against ESB, the substitute trustees, and Vasiliki Pappas, asserting that their judgment liens had not been satisfied from the foreclosure sale proceeds and asking the court to set aside the foreclosure sale and to conduct a judicial sale of the property from which their liens could be satisfied. ESB counterclaimed for a declaration as to the rights between the parties and reasserted its claim of subrogation. The trial court stayed the proceedings until the conclusion of *Pappas I*, and thereafter, on August 4, 2005, entered summary judgment for ESB. The court held that appellants' judgment liens had been "extinguished by the foreclosure sale conducted on April 3, 2001."

**3.** We explained that "subrogation is the substitution of one person to the position of another, an obligee, whose claim he has satisfied.... The basic principles underlying subrogation are the same as those in constructive trusts, prevention of merger, and equitable liens, *i.e.*, restitution to prevent forfeiture and unjust enrichment." *Pappas I*, 829 A.2d at 957 (citing G.E. Osborne, Handbook on the Law of Mortgages § 277, at 561 (2d ed. 1970)).

As appellants note, subrogation resulted in four layers of liens on the 33rd Street property: ESB's subrogation lien on top, followed by the Pappas heirs' two judgment liens, followed by the balance of ESB's loan to Vasiliki Pappas over and above the amount applied to pay off the CitiBank indebtedness.

**4.** The bidding opened at $212,000 but reopened at a lower figure after no one took up the bid at that level. There were at least eighteen bids. After the deduction of fees and costs and trustees' commissions, the net proceeds of the sale were $155,762.66. Title was conveyed to ESB by substitute trustee's deed dated June 27, 2001.

There followed this appeal. The Pappas appellants do not challenge the holding that ESB had a subrogation lien superior to theirs to the extent of $181,100.71, but contend that ESB waived or should be estopped from asserting its subrogation rights. Appellants also argue that their own judgment liens were not extinguished through the April 3, 2001 foreclosure sale. They seek to invalidate the April 3, 2001 sale, and pray for a judicial foreclosure sale through which their liens might be satisfied.

## II. Analysis

### A. The Claim That ESB Should Be Estopped from Invoking Its Subrogation Rights, and That It Waived Subrogation by Proceeding with a Non–Judicial Foreclosure

■ The general rule in this jurisdiction is that where a valid foreclosure sale yields proceeds insufficient to satisfy a priority lien, the result is extinguishment of subordinate liens. *See Waco Scaffold & Shoring Co. v. 425 Eye St. Assocs.*, 355 A.2d 780, 783 (D.C.1976) ("Since the purchase price of the property was less than the amount of advances made under the loan, which constituted a superior interest, appellants' liens were extinguished and their claims were properly dismissed."); *see also American Century Mortgage Investors v. Unionamerica Mortgage & Equity Trust*, 355 A.2d 563, 566 (D.C.1976) ("The total amount derived from the sale of the property, when credited against appellees' liens, was insufficient to satisfy these prior

liens, and therefore appellant's lien was extinguished."). Appellants contend, however, that ESB's foreclosure sale did not result in extinguishment of their liens. They assert that ESB foreclosed on the deed of trust that it recorded in 1998 rather than the deed of trust recorded by CitiBank in 1990, and they argue that ESB could not "foreclose on [its] junior lien, disregard the senior liens, and then contend that the latter were wiped out by the foreclosure."[5] At the very least, appellants assert, there were "material facts in dispute as to whether the foreclosing lien was junior or senior to the judgment liens" that should have precluded summary judgment.

We agree with appellants that ESB must be deemed to have foreclosed under the 1998 deed of trust, because the 1990 deed of trust had been satisfied and released. However, we reject appellants' assertion that ESB must be deemed to have foreclosed *solely* on its junior lien and to have waived subrogation.

Appellants' reasoning is that the information that ESB provided in the various foreclosure sale notices implied that ESB intended to foreclose only on its junior lien, and that ESB should now be estopped from asserting otherwise.[6] They argue that the Notice of Foreclosure Sale—which stated a "balance owed" of $232,747.08 as of February 28, 2001, and a cure amount of $51,273.05—was defective because the "sums stated in the Notice of Foreclosure as the 'balance owed' and 'minimum balance to cure' were not based on the

---

**5.** Appellants also contend that the trial court's finding, in its 2005 order following remand of *Pappas I*, that ESB had priority over the judgment liens to the extent of $181,100.71, denoted that the judgment liens survived as of the date of that order, and therefore precludes a finding that the judgment liens were extinguished by foreclosure in 2001. We dispose quickly of this argument, which has no merit. Nothing in the trial court's brief order suggests that it intended its ruling to be a declaration about the continued existence or enforceability of the judgment liens.

**6.** Appellants acknowledge that, but for what they allege was ESB's choice to proceed only on its junior lien, ESB "could have enforced the priority, subrogation lien, and threatened both the judgment liens and ESB's non-subrogated trust lien with extinction."

$153,000 ESB paid to retire the CitiBank note or yearly interest [on that note] at 10.5%, but on the $168,000 principal of the ESB loan and yearly interest at 14.25%, with late fees and other charges applicable under the [1998] ESB note and trust." [7]

■ We discern nothing in the foregoing information from the foreclosure sale notice that is inconsistent with ESB having foreclosed on its priority lien. The only deed of trust on the 33rd Street property that ESB held was the 1998 deed of trust. Although a portion of the indebtedness to which the 1998 deed of trust related was subordinate (and another portion was superior) to the Pappas heirs' judgment liens, *see Pappas I*, 829 A.2d at 960, that did not somehow revive the 1990 deed of trust. We see no reason why (and appellants point us to no authority for their

contention that) ESB should have completed the "balance owed," "interest rate" and "balance required to cure default" lines on the foreclosure forms by reporting anything other than the balance, interest rate and delinquency amounts under the 1998 ESB loan on which Vasiliki Pappas had defaulted. Vasiliki Pappas would have needed to cure the default on the 1998 note, by paying an amount subject to its 14.25% interest, in order to avoid the foreclosure sale, so the interest rate and cure amounts applicable to the 1998 note were the appropriate information to show on the foreclosure forms.[8] As to appellants' complaint that the foreclosure sale notices "nowhere asserted the 1990 Citibank trust or any lien interest claimed as subrogated thereto," the answer is that the applicable statute and regulation nowhere require that information.[9] Accordingly, we find no

---

7. Appellants also argue that, at the foreclosure sale, the trustees characterized the foreclosing trust as one that was behind the judgment liens. However, the affidavit of Steven Figman, on which appellants rely, states only that the trustee "did not say that the trust being foreclosed was a first trust" or "was ahead of the liens, or that the trustee sale was free and clear of the liens." The substitute trustees stated in interrogatory responses that they did "not know exactly what was announced at the auction sale."

8. Although appellants complain that the cure amount on the ESB foreclosure notices exceeded the amount of ESB's subrogation lien, they do not contend that the cure figure shown on the forms included debt that was unsecured, so we are not presented with the issue addressed in *Bank–Fund Staff Fed. Credit Union v. Cuellar*, 639 A.2d 561, 578 (D.C. 1994) ("the cure figure can only encompass debt that is secured by the property").

9. D.C.Code § 42–815(b) (2001 ed.) provides in pertinent part that:

No foreclosure sale under a power of sale provision contained in any deed of trust, mortgage or other security instrument, may take place unless the holder of the note secured by such deed of trust, mortgage, or security instrument, or its agent, gives writ-

ten notice, by certified mail return receipt requested, of said sale to the owner of the real property encumbered by said deed of trust mortgage or security instrument at his last known address, with a copy of said notice being sent to the Mayor of the District of Columbia, or his designated agent, at least 30 days in advance of the date of said sale. Said notice shall be in such format and contain such information as the Council of the District of Columbia shall by regulation prescribe.

The implementing regulations, 9 DCMR § 3100.2 (2001), state in pertinent part:

The form of the notice of a foreclosure sale of real property shall provide for furnishing at least the following information concerning the sale:

(a) The name and address of the owner of record of the property, and his or her telephone number, if known; (b) The identification of the property; (c) The lot and square number or the parcel number of the property; (d) The liber number and folio number of the volume in the Office of the Recorder of Deeds in which the security instrument is recorded and the date of such recordation; (e) The name and last known address of the maker of the note secured by the security instrument, and his or her telephone number, if

defects in the foreclosure sale notices that preclude ESB from asserting its priority lien with respect to the foreclosure sale proceeds.

Appellants rely on two cases from other jurisdictions, *Kozanjieff v. Petroff*, 215 Ind. 286, 19 N.E.2d 563 (1939), and *Jack v. Wong Shee*, 33 Cal.App.2d 402, 92 P.2d 449 (1939), for the proposition that a lienholder that forecloses on a subordinate or unsubrogated lien forfeits its right to subrogation under a deed of trust. However, the cases do not stand for such a broad proposition and, in any event, do not support appellants' contention that ESB waived its priority lien by describing in the foreclosure notices terms that related (in part) to its subordinate lien. *Kozanjieff* held only that a mortgagee who elected to levy on a judgment against a mortgagor by attaching the encumbered property, rather than to foreclose on the mortgage, "waived all the rights he might otherwise have had by virtue of the mortgage." *Id.* at 567. The decision in *Jack* rested on California jurisprudence that "the right of subrogation ... is one which may be asserted only in a civil action" at which the released first-priority trust deed "would have been revived." 92 P.2d at 453–54. The court held that because the mortgagor availed itself of the power-of-sale clause in the deed of trust instead of petitioning the court for a decree of subrogation, it waived its right of subrogation. *Id.* These cases are not relevant here, as ESB did not levy on a judgment, and there is no rule or practice in our jurisdiction that a lienholder forfeits a claim to priority of its lien under equitable principles if it forecloses without awaiting a judicial decree as to the priority of liens. *See, e.g., American Century*, 355 A.2d at 565 (a foreclosure sale of a property while competing lienholders were litigating the order of priority of their liens did not prevent the foreclosing lienholder from relying on the principle of equitable estoppel to establish the priority of its lien).

 Appellants ask us to adopt such a rule, *i.e.*, that a priority lien based on equitable subrogation is enforceable only through a judicially-supervised foreclosure.[10] We decline to do so, in part be-

---

known; (f) The name and address of the holder of the note and his or her telephone number of person to call if owner wishes to stop foreclosure; and (g) Provision for a certification by the note holder or his or her agent that the original of the notice has been sent to the property owner by certified mail, return receipt requested, and that the note holder understands that no foreclosure sale may take place until at least thirty (30) days after a copy of the notice has been received by the Recorder of Deeds, D.C.

10. Appellants urge in addition that this court should require a judicial sale of the 33rd Street property because "[t]here is sufficient equity for the court to do equity for all parties herein." They note that the 2005 District of Columbia tax assessment valued the property at $382,370—an amount which, if realized at a new foreclosure sale, presumably would be sufficient to satisfy ESB's superior lien and to satisfy a substantial portion of appellants' judgment liens. However, not only is it entirely speculative that a new sale would attract bids high enough to satisfy appellants' liens as well as ESB's priority lien, but appellants also appear to assume that a court conducting a judicially-supervised foreclosure would be obligated to ensure that the sale price at least approximates the tax-assessed value of the property. That assumption appears to be unfounded. A "property's market value is not applicable in the forced-sale context of a foreclosure." *Lewis v. Jordan Inv., Inc.*, 725 A.2d 495, 500 (D.C.1999) (finding no breach of fiduciary duty where trustees sold property for one-third of assessed value) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)); *see also GE Capital Mortgage Servs., Inc. v. Levenson*, 338 Md. 227, 657 A.2d 1170 (1995) (declining to disturb foreclosure sale at which the refinancing lender, which was owed principal of about $56,000 on its priority lien and about $75,000 on its third-tier lien, purchased the property for $45,000, extinguishing the second-tier judgment liens).

cause such a rule—which could be implicated whenever a refinance-mortgage lender forecloses on a property that is subject to one or more other liens as well—would undermine the legislative policy to avoid imposing delays on mortgage foreclosures that could restrict the flow of mortgage money into the District.[11] *Cf. G.E. Capital,* 657 A.2d at 1174, 1178–79 (requiring a mortgagee successfully to litigate its right to equitable subrogation, as a prerequisite to invoking subrogation upon a foreclosure sale, "is at odds with the policy of Maryland law to expedite mortgage foreclosures").

## B. Appellants' Due Process Argument

■ We also reject appellants' arguments that non-judicial foreclosures are inconsistent with due process and that the April 3, 2001 foreclosure sale deprived them of due process. " '[M]ost rights secured by the Constitution are protected only against infringement by governments' and not private individuals." *Woodward & Lothrop v. Hillary,* 598 A.2d 1142, 1145 n. 5 (D.C.1991) (quoting *Flagg Bros. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)). Only where a private actor's conduct "may fairly be treated as that of the State itself" can there be a violation of constitutional protections. *Flagg Bros.,* 436 U.S. at 157, 98 S.Ct. 1729 (internal quotation and citation omitted).

The Supreme Court has specifically held that a private entity's efforts to pursue collection of a debt by private means that are permissible under a state law that "merely announce[s] the circumstances under which its courts will not interfere with a private sale" is not conduct that can be ascribed to a state. *Id.* at 166, 98 S.Ct. 1729. And, in *Bryant v. Jefferson Fed. Savings & Loan Ass'n,* 166 U.S.App. D.C. 178, 509 F.2d 511 (1974), the United States Court of Appeals for the D.C. Circuit rejected a constitutional challenge to extrajudicial mortgage foreclosure in the District (which was regulated by provisions then codified at D.C.Code § 45–615 (1973), and now codified at D.C.Code § 42–815 (2001)), reasoning that there is "no significant governmental involvement in the mortgage foreclosure practices. . . ." *Id.* at 180, 509 F.2d at 513 (citing cases which have "uniformly rejected" attacks on analogous foreclosure statutes).

■ Appellees' foreclosure activities were private debt collection activities conducted pursuant to the power-of-sale clause in the 1998 deed of trust. They did not constitute governmental action subject to due process requirements.[12]

## C. Appellants' Notice Arguments

Appellants next argue that the foreclosure sale should be declared void because

---

11. In enacting the provision governing non-judicial foreclosures that is now codified as D.C.Code § 42–815(b), Congress

considered but decided against enactment of a more stringent provision which would have in *every* case required the party seeking foreclosure to secure a court order before foreclosure could be made. *The Committee felt that the delay which would inevitably result from a hearing and other procedural steps would unduly restrict legitimate financial institutions in transacting their business, and that a court foreclosure proceeding might restrict the flow of mortgage money into the District of Columbia.*

The notification requirement ultimately enacted, Congress concluded, would adequately protect the property owner.
*Young v. Ridley,* 309 F.Supp. 1308, 1311 (D.D.C.1970) (second emphasis added).

12. To be sure, protecting a property owner's constitutional right to due process may require a court to enforce strictly the statutory notice requirements that govern non-judicial foreclosures. *See Bank–Fund,* 639 A.2d at 570; *Independence Fed. Savings Bank v. Huntley,* 573 A.2d 787, 788 (D.C.1990). But, as discussed *infra,* appellants had no statutory right to notice of the ESB foreclosure.

of appellees' untimely mailing of the statutory foreclosure sale notices. They point to the facts that the substitute trustees sent notice of the April 3, 2001 sale to Vasiliki Pappas and to Renee Fox (who had been the successor representative of the Aphrodite Pappas estate) only on March 16, 2001, in violation of the thirty-day notice requirement of D.C.Code § 42–815(b). They also complain that no notice was sent to them, the individual Pappas heirs, even though they had been named individually as defendants in the *Pappas I* litigation that was underway when the foreclosure sale was announced and held.

■ Appellants have no standing to challenge the timing of the notice to Vasiliki Pappas. Not only do they cite no "injury to themselves fairly traceable to" the failure to notify her, *Jones v. District of Columbia*, 585 A.2d 1320, 1321 (D.C. 1990), but they also assert no interests that "fall within the zone of interests to be protected or regulated by the statute ... in question," which is a prerequisite for standing. *Community Credit Union Servs. v. Fed. Express Servs.*, 534 A.2d 331, 334 (D.C.1987) (internal quotation and citation omitted). In enacting the legislative provision now codified as D.C.Code § 42–815(b), Congress was concerned about homeowners—"particularly low-income homeowners ... who had been fraudulently tricked into giving second and third mortgages on their homes by a small number of unscrupulous merchants" and who "found that their homes were literally being sold from beneath them" without notice. *Young v. Ridley*, 309 F.Supp. at 1310. Nowhere did Congress indicate that the notice requirements of section 42–815(b) were intended to protect junior lienholders.

■ Nor does the statutory language give appellants a basis for complaining about appellees' failure to give them written notice of the foreclosure sale.

D.C.Code § 42–815(b) requires notice only to the "owner" of the encumbered real property and to the District; there is no statutory or regulatory requirement that a foreclosing mortgagee give notice to competing lienholders, whether subordinate or superior. At oral argument, appellants' counsel urged us to construe the statutory and regulatory mandate of timely notice of foreclosure sales to property "owners" to require that notice be given to anyone who is known to own an interest in the affected property, including junior lienholders. We note that the D.C. Circuit rejected a similar contention in *S & G Inv., Inc. v. Home Fed. Savings & Loan Ass'n*, 164 U.S.App. D.C. 263, 267, 505 F.2d 370, 374 (1974) (holding that a junior lienor was not entitled to notice of a foreclosure sale under D.C.Code § 42–815(b)). While we are not bound by the ruling in *S & G*, we find the court's reasoning persuasive, because it is consistent with the more limited legislative intent discussed above.

■ There remains the question of whether, under equitable principles, appellants were entitled to more timely and adequate notice of the ESB foreclosure sale. The answer is found in the principle, discussed in our decision in *Pappas I*, that ESB was entitled to equitable subrogation to the extent that its assuming a priority position to the extent of the CitiBank refinancing did not harm or prejudice the holders of the prior-recorded liens. *See* 829 A.2d at 960–61; *see also Annapolis Co. v. Wardman*, 59 App.D.C. 321, 323, 41 F.2d 115, 117 (1930) (applying, in the context of a foreclosure sale under a deed of trust, the maxim that "he who seeks equity must do equity in the transaction in respect to which relief is sought"). Stated differently, by invoking equitable subrogation, ESB was obligated not to do anything in accomplishing the foreclosure sale that would leave the Pappas heirs in any worse position than they were in with respect to

the CitiBank loan. With that principle in mind, we can dispose of appellants' claims that they were entitled to more timely or more direct notice of the foreclosure sale than they actually had.

Had the CitiBank trust remained in place and had CitiBank foreclosed, appellants as junior lienholders would not have been entitled by law to notice of the foreclosure sale. *See S & G,* 164 U.S.App. D.C. at 267, 505 F.2d at 374; *see also Scott v. Paisley,* 271 U.S. 632, 635–36, 46 S.Ct. 591, 70 L.Ed. 1123 (1926) (the law imposes no obligation upon the holder of a deed of trust to notify one holding a junior lien of his intention to sell the property under the deed of trust). Nor does the record disclose any term of the CitiBank deed of trust or any agreement with CitiBank pursuant to which appellants would have been entitled to notice. All that equity appears to require is that appellants not be left in a worse position than they were in originally

as a result of ESB's priority position.[13] Accordingly, we conclude that appellants were not entitled to have notice from appellees of ESB's foreclosure sale.

Having sued the Pappas heirs individually, ESB certainly knew of their interests and, as a matter of civility if nothing else, perhaps should have caused the substitute trustees to mail notice of the foreclosure sale to each of them individually.[14] For that reason, we might be troubled by the result we reach above if we were persuaded from the record that appellants were left without adequate time to protect their interests in the 33rd Street property. However, the record persuades us that appellants had ample notice that a foreclosure sale was impending. Not only did their attorney have sufficient notice from whatever source (perhaps the notice to the former representative of the Aphrodite Pappas estate) to enable him to attend the April 3, 2001 sale;[15] but also, the record

**13.** Appellants urge us to find that it is contrary to principles of equity for ESB to hold unencumbered title to the 33rd Street property when property values are rising and ESB may earn a double or triple recovery on its loan. However, equitable principles do not authorize us to balance the parties' recoveries. The "maxim of equity" can be "applied only under certain restrictions and limitations," and this court "obtains no authority from the principle to impose any arbitrary condition not warranted by settled doctrines of equity jurisprudence." *Mercantile Trust Co. v. Hensey,* 21 App.D.C. 38 (1903).

Appellants also rely on *Western Bank v. Fluid Assets Dev. Corp.,* 111 N.M. 458, 806 P.2d 1048 (1991), as persuasive authority that where a judgment lienholder is a party to a lawsuit brought by a mortgagee, and the mortgagee deliberately fails to serve notice upon the judgment lienholder of its intention to hold a foreclosure sale, equity will preserve the judgment lien as a first lien on the property. The case holding is actually much narrower. The *Western Bank* opinion indicates that the judgment lienholders in the case were entitled to notice under applicable court rules—and to survival of their liens in the absence of notice—because they had been

named as defendants in the mortgagee's complaint for judicial foreclosure. *See id.* at 1051. That is not the situation presented here.

**14.** It appears that the substitute trustees did go further than the law required by giving notice to the former personal representative of the Aphrodite Pappas estate, the judgment lienholder of record. (As we noted *supra,* the record does not indicate that the names of the Pappas heirs were contained in the land records.)

**15.** We can assume that appellants' attorney obtained that notice no more than seventeen days prior to the sale, because it was not until March 16, 2001 that notices of the April 3, 2001 sale were mailed and not until March 23, 2001 that the foreclosure sale notice was published. We have held that sixteen days' notice to an owner is not adequate notice of a foreclosure. *See Independence Fed. Savings Bank,* 573 A.2d 787. But what appellants refer to as the "benchmark minimum" amount of notice that must be afforded to protect the interests of a homeowner in default is not necessarily the measure of ade-

discloses, appellant Papageorge (and, presumably, the other appellants as well) knew of the foreclosure sale notice that ESB advertised sometime prior to February 4, 2000—more than a year before the foreclosure sale actually took place—and of the delay related to Vasiliki Pappas's bankruptcy. Appellants also had notice that ESB claimed priority as to a portion of its interest in the 33rd Street property. At the same time, they did not know the precise amount of ESB's (claimed) priority lien. This knowledge of some relevant facts and uncertainty as to others should have given appellants ample warning to monitor the situation (*e.g.*, for removal of the bankruptcy stay); ample reason to be on guard against potential ESB sale and bidding strategies;[16] ample time to act to prevent ESB's foreclosure sale (such as by asking the court to enjoin the sale) or to move first to enforce their judgment liens; and ample time to prepare to bid competitively at a foreclosure sale, if that was their intent.

In sum, we find no basis to disturb the ESB foreclosure sale, the trial court's holding that appellants' liens were extinguished by the sale, or the grant of summary judgment to ESB.

*So ordered.*

---

quate notice to a junior lienholder whose home is not at risk and who possibly has greater means, easier access to financing, and better access to legal counsel.

16. *See G.E. Capital,* 338 Md. 227, 657 A.2d 1170. This decision by our sister jurisdiction put appellants and their counsel on at least constructive notice that a foreclosing mortgagee that claims priority over judgment lien-

holders as to the refinancing portion of its loan, and that also has a subordinate interest in the property to secure additional advances, may pursue a strategy of purchasing the property at the foreclosure sale by bidding an amount that does not exceed the priority lien, thereby extinguishing the judgment liens. Accordingly, in their dealings with ESB, appellants had no reason to expect "solicitude between competing creditors." *Id.* at 1179.