*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-333

GEORGE C. PAPAGEORGE, APPELLANT,

V.

MATT BANKS, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-924-12)

(Hon. Laura A. Cordero, Trial Judge)

(Argued November 20, 2013                    Decided December 19, 2013)

*Kenneth C. Crickman*, with whom *Robert C. Cooper* was on the brief, for appellant.

*Jonathan Zucker* filed a brief for appellees.

Before THOMPSON and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

THOMPSON, *Associate Judge*:    In February 2012, appellant George Papageorge filed a one-paragraph complaint against appellees Matt and Diane Banks, alleging that they had "absconded with settlement monies and cashed a check knowing that most of the funds were liened and intended to go to the plaintiff."  Thereafter, Papageorge sought and obtained a prejudgment writ of

attachment against the Bankses, having advised the court that the Bankses had been paid funds from a settlement agreement with Eastern Savings Bank ("ESB"), and that Papageorge was entitled to those funds under a separate agreement (the "December 9, 2010 Agreement" or the "Agreement") with Matt Banks, under which Papageorge had "agreed to finance Mr. Banks' efforts to protect his rights as a tenant of certain real property." The Bankses filed a motion to dismiss the complaint or alternatively for summary judgment, arguing that the Agreement was "void as champertous."[1] Considering materials outside the complaint, the trial court treated the motion as one for summary judgment and entered judgment in favor of the Bankses, agreeing that the Agreement was champertous and therefore void in its entirety. Papageorge appeals from the trial court's grant of summary judgment in favor of appellees and from the court's denial of his motion for reconsideration of that ruling. We reverse and remand.

## I.   Background

---

[1] "Put simply, . . . champerty is maintaining a suit in return for a financial interest in the outcome[.]" *In re Primus*, 436 U.S. 412, 424 n.15 (1978).

This appeal is the latest development in a spate of litigation that erupted after deed-of-trust holder ESB purchased the property at 2507 33rd Street, S.E. (the "property"), at an April 2001 foreclosure sale.[2] The factual background set out below is largely drawn from Papageorge's opposition to the Bankses' motion to dismiss or for summary judgment.

Matt Banks was a tenant at the property prior to the April 2001 foreclosure, and he continued in occupancy for several years after the foreclosure pursuant to his purported *Valentine* rights.[3] In October 2001, Matt Banks entered into an agreement with Papageorge, the full text of which provided as follows:

---

[2] *See Banks v. ESB*, 8 A.3d 1239, 1241 (D.C. 2010); *Pappas v. ESB*, 911 A.2d 1230 (D.C. 2006); *ESB v. Pappas*, 829 A.2d 953 (D.C. 2003). We note tangentially that appellant Papageorge bears the same surname as Frances Papageorge, one of the heirs who inherited the property from Achilles Pappas upon his death in 1980. *See* 911 A.2d at 1232 & 1232 n.1.

[3] *See Administrator of Veterans Affairs v. Valentine*, 490 A.2d 1165 (D.C. 1985) (holding that the District of Columbia Rental Housing Act protected from eviction the tenant of a defaulting mortgagor who remained in his rental unit after a foreclosure sale). We say "purported" because a September 28, 2012, District of Columbia Rental Housing Commission ("RHC") Decision and Order contained in the record suggests that Matt Banks may have swapped units at the property with another tenant, thus creating some question to whether he and that tenant continued to enjoy *Valentine* rights.

> For valuable consideration I, Matt W. Banks, hereby assign[] my tenant rights to purchase under D.C. Law in the lease of 2507 33rd Street S.E.[,] Washington, D.C. 20020 to George C. Papageorge.

Subsequently, on December 9, 2010, Banks and Papageorge executed a "Memorandum Regarding Banks Lease" that affirmed this agreement, providing that "[i]t is understood and agreed that[,] with regard to the lease of 2507 33rd Street S.E.[,] Matt Banks assigned his TOPA rights . . . to George C. Papageorge under an earlier agreement which shall remain in full force and effect." As that memorandum reflects, the reference to "tenant rights to purchase under D.C. Law" in the October 2001 agreement was a reference to the opportunity to purchase the property that the parties expected that Matt Banks *qua* tenant would have under the Tenant Opportunity to Purchase Act ("TOPA"), D.C. Code §§ 42-3404.02 *et seq.* (2012 Repl.), before ESB would have been able lawfully to sell the property to a third party. *See id.* at § 42-3404.02 (a).[4]

---

[4] It appears that at the time the assignment was made, there had been no event that triggered the TOPA process (e.g., an offer by the owner to sell the property to the tenant(s), or the tenant(s)' receipt from the owner of a third-party's contract to purchase the property, giving rise to the tenant(s)' right of first refusal). *See* D.C. Code §§ 42-3404.03 and 42-3404.08 (2012 Repl.).

Eventually, ESB sued Matt Banks for possession of his rental unit, asserting that he had violated a term of his pre-foreclosure lease. The Superior Court granted ESB a judgment of possession, but, upon Banks's appeal, this court, in a December 2, 2010, opinion, reversed the judgment, holding that, because a new at-will tenancy commenced by operation of law at the time of the April 2001 foreclosure and Banks's pre-existing lease was "effectively extinguished at that juncture," Banks's putative violation of the pre-foreclosure lease could not form the basis for a judgment of possession. *Banks v. ESB*, 8 A.3d at 1243.

A week after this court issued that opinion, Matt Banks, Earl Mitchell (another former tenant and a holdover occupant of one of the property's rental units[5]), and Papageorge entered into the December 9, 2010, Agreement that is in issue in this appeal. That Agreement, a copy of which Papageorge attached to his opposition to the motion to dismiss or for summary judgment, provided in pertinent part as follows:

> Whereas, Papageorge has financed extensive litigation to enforce, maintain and protect [Banks's and Mitchell's] Valentine rights since 2001.
>
> Whereas, ESB . . . conducted a wrongful eviction on February 9, 2009 removing Banks [and] Mitchell . . . .

---

[5] See *Mitchell v. ESB*, 890 F. Supp. 2d 104 (D.D.C. 2012).

Whereas, the parties would like to file a wrongful eviction action against ESB.

Now therefore, the parties agree as follows: Any and all monies obtained from a suit for wrongful eviction and/or the relinquishment of tenant rights and/or any other sources shall be distributed as follows:

First, Papageorge shall be reimbursed for all legal costs expended since 2001 involving ESB and the subject property. Second, the remaining sum shall be distributed as follows:

Papageorge – seventy five percent (75%)
Banks – twelve and one/half percent (12.5%)
Mitchell – twelve and one/half percent (12.5%)

It is further understood and agreed that Papageorge has financed all rent monies and will be reimbursed at the rate of 100%.

Papageorge's suit against the Bankses was premised on a claim that they had received a $75,000 payment from ESB "to settle certain tenant claims," but had failed to pay Papageorge according to the terms of the December 9, 2010, Agreement. The Bankses filed their motion to dismiss or for summary judgment on February 27, 2012, and subsequently argued that the Agreement was champertous and void in that it gave Papageorge "a share of Banks' wrongful eviction and L&T litigation to which he did not have an independent interest," and in that the Agreement constituted "'a bargain to divide the proceeds of litigation

between the owner of the litigated claim and the party supporting or enforcing the litigation.'" Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss or Alternatively for Summary Judgment at 2, 4 (quoting *Design for Bus. Interiors, Inc. v. Hersons's, Inc*., 659 F. Supp. 1103, 1107 (D.D.C. 1986) (quoting 14 W. Jaeger, WILLISTON ON CONTRACTS § 1711 at 857 (3d ed. 1972)[6])). The Bankses asserted that the Agreement also "implicitly contemplated the maintenance of Banks' landlord and tenant case in order to obtain a recovery for the relinquishment of tenant rights[,]" and pointed out that after the mandate issued in *Banks v. ESB*, a motion to "Reinstate [Banks] Into Possession" had been filed, making it "abundantly clear that [one] purpose of the Agreement . . . was to maintain Banks' right to possession in the landlord and tenant case." *Id*. at 3 (internal quotations omitted).

In opposing the Bankses' motion, Papageorge argued *inter alia* that the Agreement was not champertous because he had an independent interest in the property (as to which he sought "[o]wnership") because of the assignment to him of Matt Banks's TOPA rights and because what Papageorge sought through the

---

[6] The same definition of "champerty" appears in the fourth edition of the Williston treatise. 7 Samuel Williston & Richard A. Lord, WILLISTON ON CONTRACTS § 15:1 (4th ed. 2010).

Agreement was to recover prior expenditures he had incurred to protect that interest and to "preserve his own TOPA rights." The Bankses countered that even assuming that Matt Banks had made a valid assignment to Papageorge of his mere expectant opportunity to purchase the property pursuant to TOPA, "whether Banks was injured as a result of being wrongfully evict[ed] or whether he was reinstated into possession, had no [e]ffect on the assignment." *Id*. at 5. Thus, the Bankses argued, Papageorge "had no legitimate interest in the Agreement's contemplated litigation between Banks and ESB except to receive proceeds from it." *Id*.

In granting summary judgment in favor of the Bankses, the court ruled first that Papageorge had no cause of action against Diane Banks, who was not a party to the December 9, 2010, Agreement. Addressing the complaint against Matt Banks, the trial court relied on the elements of champerty as articulated in *Marshall v. Bickel*, 445 A.2d 606, 609 (D.C. 1982). Paraphrasing *Marshall*, the court recited that those elements are that "the party's fee and claim come[] from success in the [law]suit, the costs and expenses are borne by the party with no expectation of reimbursement, and the party has no independent interest in the claim." With regard to the Agreement, the court found that the elements of champerty were satisfied. First, the court stated, Papageorge had "agreed to finance the litigation at his own expense without recovery or reimbursement except

from success in the suit." Second, the court concluded, Papageorge's "past expenses alone" for rent and litigation relating to the property did not provide him an interest in Matt Banks's claim against ESB. Nor, the court reasoned, did Papageorge's interest in Matt Banks's TOPA rights give him an independent interest in the contemplated wrongful eviction suit by Banks, because Banks's "TOPA rights would not have been affected by the outcome of any of the litigation financed by" Papageorge.

The trial court further reasoned that under this court's opinion in *Allman v. Snyder*, 888 A.2d 1161 (D.C. 2005), "the tenancy status of [a] tenant-assignor ha[s] no effect on the assigned TOPA right[.]" Order Granting Defendants' Motion to Dismiss or Alternatively for Summary Judgment at 8, citing *Allman*, 888 A.2d at 1170 (stating that the TOPA statute "says nothing about a tenant having to remain a tenant in order to sustain the validity of the assignment"). The court reasoned that Papageorge's assigned TOPA rights would not have been "cut off by the assignor ceasing to be an actual tenant" and thus "did not depend on the continuation of Matt Banks' tenancy." "Most importantly," the court reasoned, this court's decision in *Banks v. ESB* had already "established Matt Banks' tenancy." Finally, the court ruled, because the Agreement was champertous, Papageorge was not entitled to recover anything under it — not pre-Agreement

litigation expenses, not rents, and not any expense of further litigation as contemplated in the Agreement.

Papageorge sought reconsideration. He told the court that, contrary to the court's assumption in its summary judgment ruling, no wrongful eviction suit had been filed, and that the settlement funds retained by the Bankses had come not from a "successful recovery from a lawsuit," but from a "global settlement of several lawsuits" [involving the Bankses and ESB] and the Bankses' agreement to relinquish their tenant rights, including any and all rights they might have with respect to the property under TOPA. Papageorge attached to his motion for reconsideration a copy of an unsigned draft of a global settlement, and noted that it recited that the Bankses and ESB had "threatened to file additional actions to determine their respective rights concerning" the property (showing, Papageorge argued, that Banks's TOPA rights had been in jeopardy despite the ruling in *Banks v. ESB*). Papageorge further noted that the settlement disposed of an action that ESB had actually filed against the Bankses in the United States District Court for the District of Columbia (Case No. 1:11-CV-01879 (BH)), in which ESB asserted that the federal laws governing federal savings banks superseded any District rental housing law that might otherwise have afforded the Bankses continuing rights in the property as tenants. Papageorge attached a copy of the complaint in that action

to his motion for reconsideration. Papageorge also reasserted that he had an independent interest to protect that defeated any claim that the Agreement was champertous, and argued that, at a minimum, there were genuine issues of material fact regarding whether, among other things, he "was seeking to protect his own property interest rather than 'speculating in lawsuits' as the doctrine of champerty seeks to prohibit."

The trial court declined to reconsider its ruling that Papageorge "agreed to finance litigation at his own expense predicated on a wrongful eviction claim as set forth in the Agreement[.]" The court reasoned that even if the settlement funds were not the fruit of the wrongful eviction litigation contemplated in the Agreement, that did not alter the champertous purpose of the Agreement. The court also declined to consider any additional documents that Papageorge had submitted for the first time after the summary judgment ruling and ruled that the draft documents he had submitted were not "competent evidence admissible at trial." Finally, the court cited additional reasons why it rejected Papageorge's argument (which the court characterized as "circular" and self-contradictory) that the Agreement was premised on his effort to protect his TOPA rights. The court reasoned that if, as Papageorge claimed, Matt Banks had assigned his TOPA rights to Papageorge in 2001, Banks "no longer had any TOPA rights" to be defended or

"for ESB to . . . extinguish," and Papageorge therefore "could not further his own interest by supporting Matt Banks' litigation" and had "no valid reason" to agree to fund a suit by Banks. If, on the other hand, the court reasoned, Matt Banks "actually maintained his TOPA rights and could relinquish them in return for a settlement from ESB," the result was still that Papageorge "had no independent interest in further litigation between Matt Banks and ESB." In addition, the court found it "questionable" whether Papageorge "was properly assigned Matt Banks' TOPA rights" in 2001.

This appeal followed.

## II. Applicable Law

As the Supreme Court observed long ago, "cases of maintenance and champerty are founded on the principle that no encouragement should be given to litigation by the introduction of parties to enforce those rights which others are not disposed to enforce."[7] *Graham v. R.R. Co.*, 102 U.S. 148, 156 (1880). The

---

[7] "Maintenance consists in maintaining, supporting or promoting the litigation of another, with most courts requiring that the maintaining party act as an officious intermeddler and be without any interest in the litigation." Williston &

(continued…)

common law doctrine of champerty developed "to prevent an attorney from speculating in lawsuits and gambling in litigation at his or her own expense," *Marshall*, 445 A.2d at 608; thus, "[h]istorically, the prohibition against champerty was largely aimed at preventing attorneys from filing lawsuits for the purpose of obtaining fees." *Columbia Hosp. for Women Med. Ctr., Inc. v. NCRIC, Inc*. (*In re Columbia Hosp. for Women Med. Ctr., Inc.*), 461 B.R. 648, 677 (Bankr. D.D.C. 2011). Nevertheless, and "[n]otwithstanding the limited purpose of the original doctrine, champerty is not only applicable to client-attorney assignments[.]" *Id.* at 678 (acknowledging, however, that "cases involving attorney-client agreements are of limited utility when analyzing agreements that do not involve assignments to an attorney"). "If a contract is determined to be champertous, District of Columbia courts will not enforce it," and will also deny quantum meruit recovery to the party seeking enforcement. *Marshall*, 445 A.2d at 609.[8]

---

(…continued)

Lord, *supra*, § 15:1. "'Champerty' is a species of maintenance, being a bargain with a plaintiff or defendant to divide the land or other matter being sued for between them if they prevail at law; whereupon the champertor is to carry on the suit at his own expense." *Johnson v. Van Wyck*, 4 App. D.C. 294, 311 (D.C. Cir. 1894).

[8] Professor Williston observes that maintenance and champerty are "viewed by the courts with less disfavor than formerly," but notes that "schemes to promote litigation for the benefit of the promoter rather than for the benefit of the litigant or the public are regarded as contrary to public policy, and will not be enforced[,]"and that "[p]ublic policy opposes trafficking in lawsuits." Williston & Lord, *supra*, §§

(continued…)

This court has recognized "three essential elements of common law champerty: (1) the . . . fee [of the person who would seek to enforce the allegedly champertous agreement] must come from the recovery in a successful lawsuit; (2) [that person] must have no independent claim to the recovery fund; and (3) the costs and expenses must be borne by [that person] with no expectation of reimbursement from the [other party to the allegedly champertous agreement]." *Marshall*, 445 A.2d at 609. Nevertheless, as Professor Williston explains, "a person who is financially interested in the enforcement of a right of action belonging wholly or partly to another may lawfully undertake to pay the expenses

---

(…continued)

15:4, 15:5. His treatise suggests that the following observation made over a century ago remains true today:

> Many things, it is true, that were once regarded as champertous or savoring of maintenance, are no longer so characterized with us. . . . It is now lawful to stipulate for contingent fees. And it may be even meritorious to aid the poor with money in their effort to recover just legal rights by means of legal proceedings. But from the fact that some of the things which were once reprobated on some peculiar ground of existing public policy are now regarded as perfectly legitimate in view of the altered conditions of society, it does not follow that the law regarding champerty and maintenance has therefore been abolished.

*Peck v. Heurich*, 6 App. D.C. 273, 282 (D.C. Cir. 1895).

of litigation and to share in the recovery." Williston & Lord, *supra*, § 15:4 (citing Restatement (First) of Contracts, § 543 (1932)).

Thus, for example, "a person having an interest in a lease may maintain or finance litigation relating to the property, even when it appeared that the suit was being financed by one to whom the plaintiff had bargained to convey an interest in the leased premises in consideration of his instigating, maintaining and financing the litigation[.]" *Id.* Courts have held that the interest that is required to prevent an agreement to finance litigation from being champertous is a party's honest and reasonable belief that he has a legal interest in the subject matter of the litigation, even if he actually has no such interest. In *Smith v. Hartsell*, 63 S.E. 172 (N.C. 1908), for example, the court considered the validity of an agreement under which plaintiff, who claimed that a decedent owed him $750 at the time of his death, agreed with putative heirs that he would "aid them in every way to recover [under the] estate" in exchange for their agreement to pay him the $750 out of any recovery. *Id.* at 173. The court held that it was error to dismiss plaintiff's suit to enforce the agreement on the ground that it was champertous. The court relied on authorities establishing that:

> [T]he gist of the offense of maintenance is that the interference is officious; where, therefore, a party either has, or honestly believes he has, an interest, either in the subject-matter of the litigation or in the question to be determined, he may assist in the prosecution or defense of the suit, either by furnishing counsel or contributing to the expenses, and may, in order to strengthen his position, purchase the interest of another party in addition to his own. The interest may be either small or great, certain or uncertain, vested or contingent; but it is essential that it be distinct from what he may acquire from the party maintained.

> . . .

> If the pecuniary interest of a person, even though he own no part of the immediate subject-matter of the suit, be so connected with it collaterally in any way as to be diminished or increased in value by the result of such suit, we can perceive no principle of public policy that ought to forbid such person from taking proper care that such interest shall be properly protected in the courts.

*Id.* at 175 (quoting 3 Amer. and Eng. Encyc. Law at 76; *Gilman v. Jones*, 5 So. 785, 789 (Ala. 1889)).  In *Thallhimer v. Brinckerhoff*, 3 Cow. 623 (N.Y. 1824), an individual who claimed land as an heir of his father, and who was about to sue recover the possession of it, entered into an agreement with the plaintiff, who had married his sister, by which he agreed to give plaintiff one-quarter of any property recovered, and the plaintiff agreed to bear half of the expenses of prosecuting the intended suit.  The court held that the agreement was not champertous because the sister "might become the owner of these lands, as the heir of [the brother,] . . . [a]

potential interest [that] was a sufficient reason[] that her husband should join in measures to recover the lands." *Id.* at 647, 649. The court reasoned that it was "immaterial . . . whether the contingencies which must occur before [the] sister could inherit, were such as to render that event probable or not." *Id.* at 648-49. The court applied the principle that:

> [A]ny interest whatever in the subject of the suit, is sufficient to exempt him who gives aid to the suitor from the charge of illegal maintenance. Whether this interest is great or small, vested or contingent, certain or uncertain, it affords a just reason to him who has such an interest to participate in the suit of another, who also has or claims some right to the same subject.

*Id.* at 647; *accord, Lewis v. Broun*, 14 S.E. 444, 445 (W. Va. 1892) ("The doctrine of the common law as to champerty . . . cannot be applied to a person having an interest, or believing that he has an interest, in the subject in dispute, and bona fide acting in the suit[.]") (quoting 2 Story, Eq. Jur. § 1048); *Gilman, Son & Co. v. Jones*, 5 So. 785, 787 (Ala. 1889) ("[E]specially is an interference in a law suit excusable, when it is by one who has, or honestly believes he has, a valuable interest in its prosecution."); *Gibson v. Gillespie*, 152 A. 589, 593 (Del. Super. Ct. 1928) ("Necessity and justice have . . . forced the establishment of recognized exceptions to the doctrine of [champerty]," including an exception providing that "interference in a lawsuit [is] excusable when it is by one who has, or honestly believes he has, a valuable interest in its prosecution").

### III.    Discussion

We review de novo Papageorge's claim that the trial court erred in granting summary judgment in favor of Matt Banks.[9] *Onyeoziri v. Spivok*, 44 A.3d 279, 283 (D.C. 2012).  We review the trial court's denial of Papageorge's motion for reconsideration for abuse of discretion.  *Perry v. Sera*, 623 A.2d 1210, 1217 (D.C. 1993).

Papageorge argues that the Agreement that gave rise to this dispute does not meet the first element of champerty because "the source of [his] expected payment under the Agreement could have been from a source other than a successful recovery in a lawsuit" (e.g., "the relinquishment of tenant rights and/or any other sources"); because the funds he seeks to recover did in fact come from a source other than a successful recovery in a lawsuit; and because "no litigation was ever even filed after the Agreement was signed."  Thus, he argues, the trial court erred

---

[9]  Diane Banks joined Matt Banks as an occupant of the property on a date not disclosed by the record, before Papageorge filed the instant lawsuit, but was not a party to the Agreement under which Papageorge seeks to recover. Papageorge does not contest the trial court's ruling as to Diane Banks; accordingly, we affirm the trial court's entry of judgment in her favor.

in reasoning that there was "no agreement for [Papageorge] to be reimbursed in any way other than through the success of . . . litigation." This argument is not persuasive. Unless an exception applies, an agreement to finance litigation at one's own expense in exchange for a share of the proceeds is champertous where it is made for the purpose of stirring up and inducing litigation which otherwise would not be commenced. *See Van Wyck*, 4 App. D.C. at 319-20. Because the December 9, 2010, Agreement contemplated that a wrongful eviction suit would be filed to redress the rights of Banks (and Mitchell),[10] that Banks (and Mitchell) would not pay the costs therefor, and that Papageorge would take the lion's share of the proceeds of the litigation, the Agreement bore the hallmarks of champerty. The fact that Papageorge now seeks his bargained-for share from a recovery that was pursuant to a settlement rather than the contemplated litigation does not change the fact that (unless an exception applies) the overall bargain involved champerty. It is irrelevant that the agreement may have contained other, non-champertous terms.[11]

_____

[10] Papageorge cleared up any doubt regarding this aspect of the bargain through the affidavit that he filed to support his motion for prejudgment attachment, in which he characterized their agreement as one "under which I agreed to finance Mr. Banks' efforts to protect his rights as a tenant of certain real property."

[11] Under the principle set out in the Restatement (Second) of Contracts § 184, the portion of the Agreement not involving the (allegedly champertous and

(continued…)

Papageorge's first argument is unavailing, but we agree with his second contention: that the court should not have granted summary judgment since Papageorge claims to have had at the time of the Agreement an interest in Banks's claim against ESB, and in protecting Matt Banks's possessory interest in the property, that rendered the agreement non-champertous. The trial court cited a number of reasons why it rejected Papageorge's claim that he had such an interest. We conclude, for the reasons that follow, that none of the reasons withstands scrutiny.

---

(…continued)

thus unenforceable) promise to finance litigation at Papageorge's expense in exchange for a share of the litigation proceeds might be enforceable "if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Restatement (Second) Contracts § 184 (1). Here, however, the record suggests no reason to think that Banks and Mitchell would have entered into an agreement to share the proceeds of a settlement reached without litigation if Papageorge had not agreed to finance the contemplated litigation at his expense. That promise appears to have been the consideration for the Agreement and thus to have been an essential part of the agreed exchange. *Cf. Conte v. Woomer (In re Woomer)*, Case No. 11-43457, Chapter 7, Adversary No. 12-4017, 2013 Bankr. LEXIS 4223, *35 (Bankr. E.D. Tex. Oct. 7, 2013) ("The relevant inquiry is whether or not the parties would have entered into the agreement absent the unenforceable part. . . . If the intent of the parties is unclear, the court will presume the promises are dependent rather than independent") (internal quotations omitted).

First, we reject the trial court's conclusion that Papageorge's "past expenses alone" for rent and litigation relating to the property could not provide him an interest in Matt Banks's potential wrongful eviction claim against ESB. We think the better rule is as stated in *Smith v. Hartsell*, *Thallhimer v. Brinckerhoff*, and other cases cited above: that a party who has an interest in a plaintiff's claim as basis for repayment of an existing indebtedness or for protecting a contingent interest is not an officious intermeddler, but instead may agree to support the plaintiff's litigation and share in any recovery without committing champerty.[12] We need not pause over whether Papageorge made an adequate showing that he had an interest because of rent and/or litigation expenses, because the trial court did not grant summary judgment on the ground (and the Bankses did not argue) that Papageorge failed adequately to document those putative bases for his interest in Matt Banks's claims.[13]

---

[12] *Cf. Sampliner v. Motion Picture Patents Co.*, 254 U.S. 233, 239-40 (1920) (reversing a directed verdict entered in favor of the defendants on their defense of champerty, where "some substantial evidence strongly tended to show" that the plaintiff's interest in the litigation through an assignment of rights against the defendants "was taken in extinguishment of an existing indebtedness and not for mere speculation upon the outcome of intended litigation"); *Gibson*, 152 A. at 593 ("Any evidence which shows that the plaintiff had a real and proper interest in the note, would show that the assignment was not champertous.").

[13] We note that in the affidavit he submitted in support of his motion for prejudgment attachment, Papageorge averred that, from the proceeds of Matt

(continued…)

But even if Papageorge did not document that interest in a way adequate to avoid summary judgment, he also claimed an interest based on the assignment to him of Matt Banks's TOPA rights, and he did provide evidence of the assignment and subsequent memorandum affirming it. That is the backdrop of our second point: We do not agree with the trial court that it was clear that Papageorge's "TOPA rights could not have been affected by the outcome of any of the litigation financed by" Papageorge. As described above, the court reasoned that under *Allman v. Snyder*, "the tenancy status of [a] tenant-assign[]or ha[s] no effect on the assigned TOPA right" — i.e., that whether Matt Banks remained a tenant or not was irrelevant to the existence of Papageorge's TOPA rights. However, *Allman* decided only that a tenant who still had that status at the time the owner sent a TOPA offer of sale did not lose his TOPA rights merely because he vacated his rental unit before the TOPA process had concluded. We did not consider in *Allman* the quite different issue of whether, where no offer of sale has yet been made, a tenant must remain in possession (or retain a possessory interest) in order to accede to TOPA rights when an offer of sale ultimately is made. We need not decide that issue here; for present purposes, it suffices to conclude, as we do, that it

_____

(…continued)
Banks's settlement with ESB, "$20,000 was paid to [Papageorge's] attorney for a portion of [Papageorge's] legal costs."

would not have been unreasonable for Papageorge to believe that Banks needed to be restored to possession of the property in order to have his TOPA rights triggered at the time of an offer of sale by ESB, and further to believe — even if mistakenly — that without that restoration Papageorge's assigned TOPA rights would be in jeopardy.[14] And while the wrongful eviction lawsuit contemplated in the Agreement presumably would have had as one object the recovery of money damages, another possible remedy would have been restoration of Matt Banks's possession of the property. *Cf. Schwartz v. Certified Mgmt. Corp.*, 539 N.Y.S.2d 332, 333 (N.Y. App. Div. 1989) (explaining that "[r]estoration of possession . . . is a common remedy for wrongful eviction").

Third, contrary to the trial court's reasoning, this court's opinion in *Banks v. ESB* did not conclusively establish Matt Banks's possessory interest in the property such that no further litigation on that issue could have been necessary. For one thing, while this court's opinion set the stage for Banks to seek restitution of possession,[15] this court did not order restitution of possession, and thus further

---

[14] As the Bankses' brief acknowledges, TOPA rights accrue only to "person[s] entitled to the possession, occupancy or benefits of a rental unit within a housing accommodation[.]" D.C. Code § 42-3401.03 (17) (2012 Repl.).

[15] *See Hohensee v. Manchester*, 102 A.2d 461, 462 (D.C. 1954).

litigation was necessary to achieve that result.[16]  In addition, the record shows that

even after Banks was restored to possession, ESB filed, on October 26, 2011, a

lawsuit in the United States District Court for the District of Columbia seeking to

eject him from the property on grounds other than those this court rejected in

*Banks v. ESB*.[17]  ESB presumably would have relied on the same grounds in

opposing the wrongful eviction suit contemplated in the Agreement. Thus, if Matt

Banks's continued occupancy of the property was necessary to protect his

---

[16]  The record indicates that Banks applied in the Landlord Tenant Court for an order restoring him to occupancy of his unit and obtained the requested relief in September 2011.

[17]  Papageorge submitted a copy of ESB's signed complaint in that lawsuit in support of his motion for reconsideration.  The court declined to consider any documents that had not been before it at the time of its summary judgment ruling, but it failed to take into account that, in their Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss or Alternatively for Summary Judgment, the Bankses, too, had drawn the court's attention to ESB's District Court complaint and supplied its docket number (telling the court that after the Landlord/Tenant court reinstated Matt Banks to possession of the property, "ESB filed suit in federal court [in Case No. 1:11-CV-01879 (BH)] on October 26, 2011 against Banks for ejectment[.]").  Furthermore, while the trial court declined to consider the draft settlement documents and other unsigned documents that Papageorge submitted with his motion for reconsideration on the additional ground that they did not constitute competent and admissible evidence, the court did not explain why it declined to consider the ESB complaint, of which it was made aware (by appellees) before entering its summary judgment ruling.  That document was neither a draft document nor unsigned, it bore a District Court date-stamp, and it was not hearsay (since it was submitted not for the truth of anything ESB asserted therein, but as evidence that ESB has filed the lawsuit).  Declining to consider this document was an erroneous exercise of the court's discretion.

expectant TOPA rights (and to protect the benefit Papageorge sought through an assignment of those rights), the necessity of further litigation was not erased upon issuance of this court's opinion in *Banks v. ESB*.[18]

As noted above, in explaining why it concluded that Papageorge did not have an independent interest in the litigation that the Agreement contemplated, the trial court also stated that it was "questionable" whether Papageorge "was properly assigned Matt Banks' TOPA rights" in 2001. The court noted that the Rental Housing Act specifies that an assignment of TOPA rights "may occur at any time in the process provided in this subchapter," D.C. Code § 42-3404.06 (2012 Repl.), which it took to mean "the period of time during which an offer of sale is made on the property." The court noted that the assignment to Papageorge was not made in the context of an offer of sale having been made on the property — and thus, the court reasoned, its validity was in doubt. This is another issue that we need not resolve definitively. The question is whether Papageorge could reasonably have

---

[18] In opposing Papageorge's motion for reconsideration, the Bankses cited the September 2012 RHC decision that, it asserted, established that any TOPA rights Banks may have had were extinguished before the date of the Agreement. However, even if the RHC decision was authoritative on that point, that does not mean that Papageorge could not reasonably have believed on December 9, 2010, (the date of the Agreement) that Banks continued to have expectant TOPA rights that would inure to Papageorge, as assignee, upon a triggering event.

thought that he had a valid assignment of Banks's (purported) TOPA rights. We think he could have reasonably so believed.

Although the trial court correctly noted the language of § 42-3404.06 (i.e., that an assignment of TOPA rights "may occur at any time in the process provided in this subchapter"), the section also specifies that an assignment "may be structured in any way the tenant, in the tenant's sole discretion, finds acceptable." At least arguably, an assignment of expectant TOPA rights is a permissible "structure" under the statute — or Papageorge could have reasonably so thought. Further, the legislative history of the statutory amendment that inserted the "at any time in the process provided in this subchapter" clause shows that the legislative purpose was to clarify that the Council of the District of Columbia did not intend to impose limits on tenant assignments such as had been the subject of prior litigation.[19] Given the Council's intent to remove impediments to tenant assignments, we do not think § 42-3404.06 must necessarily be read to restrict

---

[19] *See* Council of the District of Columbia, Committee on Consumer and Regulatory Affairs, Report on Bill 11-53, "Rental Housing Conversion and Sale Act of 1980 Reenactment and Amendment Act of 1995," Mar. 14, 1995, at 11 (noting that the issue of whether tenants could assign their rights to a private or public third party had been "the subject of more litigation than virtually all other issues under the Act combined," with a ruling in one case that the "assignment could only be to a public agency").

assignments to the period after there has been an offer of sale, if a tenant prefers a different structure. In addition, while we do not decide the ultimate issue, it would not have been unreasonable for Papageorge to assume that that an assignment of anticipated TOPA rights could be made under a principle similar to the doctrine of after-acquired title. Under that doctrine, "if a grantor purports to transfer ownership of real property to which he lacks legal title at the time of transfer, but subsequently acquires legal title to the property, the after-acquired title inures, by operation of law, to the benefit of the grantee." *Ackerman v. Abbott*, 978 A.2d 1250, 1254 (D.C. 2009) (internal quotations omitted); *see also Douglas v. Lyles*, 841 A.2d 1, 4 (D.C. 2004) ("[A]t common law a presumptive heir can assign to a third party as ephemeral an interest as his or her expectancy interest."); *Columbian Carbon Co. v. Kight*, 114 A.2d 28, 32 (Md. 1955) ("The grantor who executes a deed purporting to convey land to which he has no title or to which he has a defective title at the time of conveyance will not be permitted, when he afterwards acquires a good title to the land, to claim in opposition to his deed.").

The additional rationales the court cited in concluding that Papageorge did not have an independent interest in the litigation were that (1) if Matt Banks had effectively assigned his TOPA rights to Papageorge, then Banks had no standing to bring suit to protect those TOPA rights, and Papageorge had no valid reason to

agree to fund a suit by Banks; and, alternatively, (2) Banks's eventual relinquishment of his TOPA rights as part of his settlement with ESB meant that Papageorge did *not* actually have an interest in those TOPA rights.  We think these rationales fail.  Again by analogy to the doctrine of after-acquired title, we think it correct to say that Banks, if he made a valid assignment of his expectant TOPA rights, retained standing to protect those rights until the moment when they came into fruition (and immediately thereafter passed to Papageorge).  *Cf. Ackerman*, 978 A.2d at 1254 ("Having conveyed title he did not have, when the grantor finally does acquire title, the doctrine operates to vest title automatically in the grantee."). The fact that Banks eventually relinquished to ESB an interest he had already conveyed as an expectancy interest to Papageorge — in breach of the 2001 assignment, Papageorge presumably would claim — does not mean that Papageorge had no interest at the time of the Agreement, even though it was a contingent or expectancy interest rather than a vested one.

In sum, on the present record, it appears that Papageorge could reasonably have believed that he had an independent interest in the property, in Matt Banks's prospective claim for wrongful eviction, and in protecting Banks's expectant TOPA rights, such that Papageorge's agreement to finance litigation to protect these interests was not champertous.  Whether Papageorge honestly believed he

had such an interest, if that be disputed, was not resolvable on summary judgment.

Accordingly, Matt Banks was not entitled to summary judgment.

*Reversed and remanded.*