NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

JP MORGAN CHASE BANK, N.A., a national association, in its
independent capacity and as successor-in-interest to WASHINGTON
MUTUAL BANK, F.A., *Plaintiff/Appellee*,

*v.*

MGM IV, LLP, a limited liability partnership; LAS VEGAS INVESTMENT
HOLDINGS, INC., a Nevada corporation, *Defendants/Appellants*.

No. 1 CA-CV 13-0145
FILED 8-11-2016

---

Appeal from the Superior Court in Maricopa County
No. CV2009-000258, CV2009-019233 (Consolidated)
The Honorable Katherine Cooper, Judge

**AFFIRMED**

---

COUNSEL

Dickinson Wright PLLC, Phoenix
By Timothy J. Thomason, Michael J. Plati, Anne L. Tiffen
*Counsel for Plaintiff/Appellee*

Burch & Cracchiolo, P.A., Phoenix
By Daryl Manhart, Andrew Abraham
*Counsel for Defendant/Appellant MGM IV, LLP*

Chester & Shein, P.C., Scottsdale
By David E. Shein, Sonia M. Phanse, Todd M. Adkins
*Counsel for Defendant/Appellant Las Vegas Investment Holdings, Inc.*

---

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Maurice Portley and Judge Andrew W. Gould joined.

---

**W I N T H R O P,** Presiding Judge:

¶1 Defendants/Appellants, MGM IV, L.L.P. ("MGM") and Las Vegas Investment Holdings, Inc. ("LVIH") (collectively, "Appellants"), appeal the trial court's judgment quieting title in favor of Plaintiff/Appellee, JP Morgan Chase Bank, N.A. ("Chase"). The judgment and this appeal arise from consolidated matters that required the trial court to resolve a priority dispute between competing deeds of trust encumbering a single-family residence located in Phoenix, Arizona ("the Property"). Chase, as successor to Washington Mutual Bank, F.A. ("WaMu"), was the beneficiary under one of the deeds of trust ("the WaMu DOT"). LVIH, as the successor to Jane Popple, was the beneficiary under the other deed of trust ("the Popple DOT"). MGM, whose principal is Gary Shuster, purportedly purchased the Property at a trustee's sale conducted with respect to the Popple DOT.

¶2 Appellants raise numerous issues, arguing they were entitled to judgment in their favor and the trial court committed various errors warranting reversal. We agree with the trial court, however, that Chase held the senior lien on the Property at the time of the trustee's sale involving the WaMu DOT because WaMu was equitably subrogated to the first lien position when it paid off two prior senior liens. Furthermore, the first priority lien status of the WaMu DOT was not changed by subsequent events, and the trustee's sale of the WaMu DOT extinguished the subordinate lien of the Popple DOT. Finally, we find no error in the trial court's evidentiary rulings, including that MGM was precluded from presenting a bona fide purchaser for value without notice defense at trial. Consequently, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3 Popple purchased the Property in August 2005. She subsequently took out two loans on the Property: (1) a $2.475 million refinance loan secured by a deed of trust recorded by AHM Mortgage ("the

AHM DOT") in July 2006, and (2) a $1.35 million loan secured by a deed of trust recorded by Compass Bank ("the Compass DOT") in February 2007.

¶4 Popple decided to sell the Property, and purportedly sought $6.2 million for it.[1] In March 2007, Ken Berrydane offered to buy the Property for $8.25 million, and Popple accepted his offer.[2]

¶5 The parties opened an escrow for the sale with Financial Title Company ("Financial Title") in Las Vegas. Berrydane applied for and received a secured loan for $6.6 million from WaMu. WaMu's closing instructions to Financial Title conditioned the loan on ensuring WaMu's loan would be secured by a "first lien."

¶6 On July 19, 2007, Berrydane executed both a DOT securing WaMu's $6.6 million purchase money loan and a "Uniform Residential Loan Application." That same day, Popple executed a Warranty Deed conveying the Property to Berrydane and an "Affidavit of Property Value." In the Affidavit, Popple affirmed under oath that the sale to Berrydane was for $8.25 million and was being financed with a conventional "[n]ew loan(s) from [a] financial institution."[3]

¶7 Before close of escrow, Berrydane and Popple made a side agreement modifying the sale terms. At Berrydane's request, Popple agreed to assign $3.275 million of her net sale proceeds to R and R Affiliates, Inc. ("R&R"), an entity controlled by Berrydane.[4] In return, Berrydane

---

[1] At trial, Popple testified she did not formally list the Property for sale, but relied on "word of mouth" and "[s]ometimes" ran ads in the newspaper.

[2] Popple knew Berrydane before he offered to buy the Property. They had owned homes next door to one another in Las Vegas, Nevada, and Berrydane had purchased Popple's Las Vegas home. Popple has been a full-time property investor since 1998, and the record supports the conclusion that Popple and Berrydane, as well as Shuster, are sophisticated businesspersons with substantial experience in real estate matters.

[3] At trial, however, Popple denied knowing about the WaMu loan before closing and testified she understood Berrydane had been unable to get a bank loan and was obtaining the funds from investor friends.

[4] Popple testified she knew Berrydane controlled R&R, but denied understanding why Berrydane wanted the deal structured with the

agreed to give Popple a $1 million seller carryback loan, which was to be secured by a $1 million deed of trust (the Popple DOT). The net result of the Berrydane-Popple side agreement was an actual purchase price of $5.975 million (which was slightly less than Popple's original $6.2 million list price), not $8.25 million.

¶8             Popple instructed her attorney, Richard Tobler, to prepare the documents she needed for the side deal with Berrydane. Tobler drafted an indemnity agreement between Popple and Berrydane, which summarized the $3.275 million purchase assignment and obligated Berrydane to indemnify Popple if his lender sued her in connection with it.[5] The indemnity agreement specifically referenced a "purchase money loan" and stated that "Popple has no privity or relationship with Indemnitor's lender to determine whether the request [by Berrydane for the $3.275 million credit] is consistent with the loan documentation" and that she would "not grant the Credit without having Indemnitor enter into this Agreement." Tobler also drafted (1) an escrow instruction directing Financial Title to wire $3.275 million to R&R, (2) a $1 million promissory note reflecting Popple's carryback loan terms, and (3) a $1 million DOT to Popple (the Popple DOT).

¶9             On July 26 and 27, 2007, Berrydane and Popple executed the indemnity agreement, the Popple note, the Popple DOT, and the $3.275 million payment instruction outside of escrow.

---

assignment. Her attorney explained at trial, however, that "there w[ere] ulterior motives behind this type of sale," and the assignment was likely part of a scheme commonly used in Nevada called "salting the purchase price," which allows a buyer to (1) misrepresent the purchase price to subsequent buyers and (2) minimize or evade long-term capital gains taxes on a subsequent sale.

[5]       Tobler testified that Popple was his sole source of information about her deal with Berrydane. Tobler stated he did not know who was funding Berrydane's purchase, but when Berrydane sought the $3.275 million assignment, Tobler drafted the indemnity agreement in an attempt to provide legal protection to Popple from federal authorities, such as the IRS, which might seek to treat Popple as having received the price differential or otherwise be involved in a money laundering or other fraudulent scheme.

**¶10** On July 30, 2007, escrow closed at the Financial Title office in Las Vegas. In exchange for its loan, WaMu received the WaMu DOT, and Financial Title disbursed (1) $2,588,519.42 and $1,354,399.18 (a total of $3,942,918.60) to pay off the AHM DOT and the Compass DOT, respectively;[6] (2) $3.275 million to R&R; and (3) approximately $1 million to Popple.[7] Although Financial Title was provided with the document assigning the $3.275 million to R&R, neither Popple nor Berrydane advised the escrow agent that R&R was controlled by Berrydane.[8]

**¶11** On August 2, 2007, Popple recorded the Popple DOT. On August 7, 2007, Financial Title recorded the WaMu DOT and the Warranty Deed from Popple to Berrydane. Consequently, according to the order of public recording (and unbeknownst to WaMu), the Popple DOT was listed in a position superior to that of the WaMu DOT.

**¶12** In 2008, Berrydane defaulted on the loan secured by the WaMu DOT. WaMu obtained a Trustee Sale Guarantee (a title report prepared in connection with a foreclosure), and on April 23, 2008, WaMu

---

[6] On August 30, 2007, a Substitution of Trustee and Full Reconveyance was prepared for the AHM DOT, and a release for the Compass DOT was prepared on March 31, 2008.

[7] The seller's escrow Settlement Statement stated in part: "Name of Borrower: Ken Berrydane," followed by "Name of Lender: Washington Mutual Home Loans." At her deposition, Popple acknowledged receiving estimated closing statements at closing, and when presented at trial with a copy of the seller's Settlement Statement and confronted with the fact it had been provided as part of discovery by LVIH, Popple affirmed "this is the kind of thing I got right here at closing." Popple then changed her testimony, stating that "the one I received didn't have anything about Washington Mutual on it. So there's got to be another one." Upon further questioning, however, she admitted she "didn't notice" whether the seller's Settlement Statement she received at closing included the name of the lender because she "didn't really look at it." The trial court ultimately found Popple had received a copy of the seller's Settlement Statement at or before closing.

[8] The court is at this point reminded of a quote in a Scottish poem by Sir Walter Scott (but often attributed to William Shakespeare): "O, what a tangled web we weave, When first we practise to deceive!" Sir Walter Scott, *Marmion* Canto VI, at XVII (1808).

issued a Notice of Trustee's Sale to foreclose the WaMu DOT, *see* Ariz. Rev. Stat. ("A.R.S.") § 33-808,[9] initially scheduling the sale for July 23, 2008.

¶13         WaMu also learned its first position priority was disputed, and it sent a letter dated June 30, 2008, asking Popple to acknowledge the Popple DOT was either invalid or subordinate to WaMu's DOT, and that WaMu's DOT was equitably subrogated to the prior AHM and Compass liens. In a letter from Tobler, Popple refused, and on July 21, 2008, she assigned her beneficial interest in the Popple DOT to her newly formed corporation, LVIH.

¶14         The trustee's sale involving the WaMu DOT was postponed until October 2008. Although Popple had notice of the scheduled trustee's sale, neither she nor LVIH attempted to stop the sale. On September 25, 2008, Chase formally acquired the WaMu DOT.

¶15         On October 21, 2008, Chase bought the Property as the foreclosing beneficiary with a credit bid of $4,010,000 ("the 2008 Sale").[10] A

---

[9]     We cite the current version of the statutes throughout this decision, unless changes material to our decision have occurred since the relevant dates.

[10]    Pursuant to A.R.S. § 33-801(5), a "credit bid" is

> a bid made by the beneficiary in full or partial satisfaction of the contract or contracts which are secured by the trust deed. Such credit bid may only include an amount up to the full amount of the contract or contracts secured by the trust deed, less any amount owing on liens or encumbrances with interest which are superior in priority to the trust deed and which the beneficiary is obligated to pay under the contract or contracts or under the trust deed, together with the amount of other obligations provided in or secured by the trust deed and the costs and expenses of exercising the power of sale and the sale, including the trustee's fees and reasonable attorney fees actually incurred.

A home lending research officer for Chase explained that, by submitting a credit bid, Chase "opened the bid. We don't pay ourselves any money because the debt[']s owed to us, but if someone else wants to purchase it, they have to bid at least a dollar over that." She further explained that, with accrued interest, the combined payoff amount for the AHM and Compass

Trustee's Deed Upon Sale was issued to Chase and recorded on October 29, 2008.

¶16         As he had with the loan secured by the WaMu DOT, Berrydane had also defaulted on the loan secured by the Popple DOT. In November 2008—shortly after the 2008 Sale—LVIH scheduled a trustee's sale for February 20, 2009, to foreclose the Popple DOT.

¶17         On January 13, 2009, Chase filed a complaint (Maricopa County Superior Court Cause No. CV2009-000258) seeking to quiet title to the Property in favor of Chase. Chase sought a declaration that the WaMu DOT held the first position on the Property and the Popple DOT was extinguished by the 2008 Sale. Chase also asserted that, even if the Popple DOT was in a priority position, the court should apply principles of equitable subrogation and find Chase was entitled to a first position equitable lien by paying off the previous senior liens of AHM and Compass.

¶18         On February 10, 2009, Chase filed a First Amended Complaint and an application for an order to show cause, temporary restraining order ("TRO"), and preliminary injunction, seeking to enjoin the scheduled trustee's sale under the Popple DOT. *See* Ariz. R. Civ. P. 65(a), (d). However, in a minute entry dated February 18 and not filed until February 20, 2009, the trial judge presented with the application denied Chase's TRO request. Meanwhile, on February 19, 2009, Chase filed a notice of lis pendens.[11]

---

loans would have been "well above $4,010,000" by the time Chase purchased the Property at the 2008 Sale.

[11]     The lis pendens was ultimately not admitted into evidence, and the trial court declined to take judicial notice of its indexing. *See* A.R.S. § 12-1191(B). We nevertheless note that the notice of lis pendens was not indexed until after the sale; however, the eventual buyer of the Property (MGM's principal, Shuster) testified he "never looked" to see if a lis pendens had been filed. Instead, after learning the Property was listed for sale (for $2.6 million), initially checking the title, and briefly walking the Property, which was in his neighborhood, Shuster did nothing more to investigate the Property's status, despite thinking the listed price was "unusual" in that it "was fairly low for the area," and later being advised at the sale that "there was a problem with the property" and a lawsuit had been filed. (At the outset of the February 20, 2009 trustee's sale, two attorneys representing Chase announced that Chase claimed title to the

**¶19** On February 20, 2009, the trustee's sale for the Popple DOT ("the 2009 Sale") was held. The Property was sold to MGM (through Shuster) for $1,080,000.[12]

**¶20** In June 2009, Chase filed a second quiet title action (Maricopa County Superior Court Cause No. CV2009-019233) against MGM. That case was consolidated with Cause No. CV2009-000258.

**¶21** In its answer, MGM did not assert as a defense that it was a bona fide purchaser for value without notice, and did not affirmatively raise that defense throughout the ensuing litigation. Instead, MGM raised that defense for the first time in the parties' joint pretrial statement filed April 24, 2012, and Chase objected and moved to preclude the defense as untimely. The trial court precluded MGM's bona fide purchaser for value without notice defense, stating that its ruling was "based on untimely disclosure (Rule 26.1) and A.R.S. § 33-811(E). MGM stands in Popple's shoes. Evidence regarding notice and prejudice to MGM is not relevant and is precluded."

**¶22** In response to cross-motions for summary judgment on Chase's equitable subrogation claim, the trial court ruled Chase had met several necessary criteria for equitable subrogation because (1) WaMu had paid off the existing AHM and Compass liens to protect its own interest in the Property, with its closing instructions conditioning the $6.6 million loan on the assurance that its loan would be secured by a first lien; (2) Popple, the intervening lienholder, was not legally prejudiced; and (3) if equitable subrogation were not applied, Popple would be unjustly enriched. The court, however, denied summary judgment in favor of either side after concluding issues of fact existed regarding whether Chase had "unclean hands" that might preclude equitable subrogation.

---

Property and a lis pendens had been recorded.) Shuster gave this portion of his testimony at trial out of the hearing of the jury as part of MGM's offer of proof that it was a bona fide purchaser for value without notice after the trial court granted Chase's motion to preclude that argument. *See infra* at ¶ 21.

[12] Although Appellants decry the lack of "vigorous" bidding at the 2008 Sale, we note that Popple's former neighbor, Shuster, was the sole bidder at the 2009 Sale. MGM (Shuster) has maintained possession of the Property since the 2009 Sale.

**¶23** Between May 29 and June 5, 2012, the parties tried the case with an advisory jury. At the close of trial, the advisory jury made two findings: (1) Popple did not have notice of WaMu's DOT at the time she recorded the Popple DOT, and (2) WaMu had acted with unclean hands with respect to the Property.[13] On June 25, 2012, the parties filed separate proposed Findings of Fact and Conclusions of Law.

**¶24** Despite the advisory jury's findings, the trial court ruled in a minute entry filed July 27, 2012, that Chase was entitled to quiet title in its favor.[14] The court concluded Chase had the senior lien on the Property because (1) Popple had recorded her DOT with notice of the WaMu DOT, and (2) WaMu was equitably subrogated to the position of the AHM and Compass senior liens when it paid off those loans. The court rejected Appellants' argument that Chase should be precluded from its subrogated lien position on the basis of unclean hands, finding that Chase did not act with unclean hands and, "[e]ven if Chase could be found to have acted inequitably, Chase's hands are pristine as compared to Popple's."

**¶25** On November 14, 2012, the trial court issued a judgment quieting title in the Property in favor of Chase, dismissing all other claims between the parties, and awarding Chase its costs and attorneys' fees. On February 13, 2013, the trial court issued a signed order denying Appellants' motions for new trial.

**¶26** MGM and LVIH each filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1) and (5).

## ANALYSIS

### I. Equitable Subrogation

**¶27** "Equitable subrogation is 'the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt.'" *Sourcecorp, Inc. v. Norcutt*, 229 Ariz. 270, 272, ¶ 5, 274 P.3d 1204, 1206 (2012) (quoting

---

[13] The trial court rejected this finding by the jury, after concluding the court had "erred in instructing the jury that Chase had the burden to prove that it did not have unclean hands."

[14] A trial court is not bound by an advisory jury and is free to reach its own factual conclusions if supported by substantial evidence. *See, e.g., Wooldridge Constr. Co. v. First Nat'l Bank of Ariz.*, 130 Ariz. 86, 88, 634 P.2d 13, 15 (App. 1981).

*Mosher v. Conway*, 45 Ariz. 463, 468, 46 P.2d 110, 112 (1935)). As an equitable remedy, it is designed to prevent the injustice that would occur if one person receives a windfall at the expense of another. *Id.* (citations omitted). In this context, application of the doctrine would allow a subsequent lender (WaMu) who supplies funds used to pay off a primary and superior encumbrance (the AHM and Compass liens) to be substituted into the priority position of the primary lienholder (AHM and Compass), despite the recording of an intervening lien (the Popple DOT).

¶28　　　Equitable subrogation may be applied when a party pays a pre-existing debt to protect an interest in a property, irrespective of any agreement that the party will succeed to the position of the prior lienholder. *Id.* at 275, ¶ 21, 274 P.3d at 1209. The key concern underlying equitable subrogation is the prevention of unjust enrichment to an intervening lienholder. *See id.* at ¶ 23. Additionally, an over-arching legal principle exists that a party seeking equitable relief must have "clean hands" to obtain the relief sought. *Smith v. Brimson*, 52 Ariz. 360, 364-65, 80 P.2d 968, 969-70 (1938). To have "unclean hands," a party must willfully engage in immoral conduct. *See Weiner v. Romley*, 94 Ariz. 40, 42-43, 381 P.2d 581, 582-83 (1963). Nonetheless, equitable relief may be warranted even for a party who acts inequitably when the other party is more culpable for its actions. *Coleman v. Coleman*, 48 Ariz. 337, 341, 61 P.2d 441, 443 (1936).

¶29　　　In general, we review the trial court's factual findings for clear error. *See Harrington v. Pulte Home Corp.*, 211 Ariz. 241, 246-47, ¶ 16, 119 P.3d 1044, 1049-50 (App. 2005). We review *de novo*, however, the court's conclusions of law and the interpretation of statutes. *See Town of Marana v. Pima Cty.*, 230 Ariz. 142, 152, ¶ 46, 281 P.3d 1010, 1020 (App. 2012); *Pelletier v. Johnson*, 188 Ariz. 478, 480, 937 P.2d 668, 670 (App. 1996). Determination of a party's entitlement to equitable subrogation is a question of law subject to *de novo* review. *See, e.g., Lamb Excavation, Inc. v. Chase Manhattan Mortg. Corp.*, 208 Ariz. 478, 480, ¶ 5, 95 P.3d 542, 544 (App. 2004), *declined to follow in part by Sourcecorp*, 229 Ariz. at 273-75, ¶¶ 9-21, 274 P.3d at 1207-09.

¶30　　　After reviewing the record, we find no error in the trial court's conclusion that the criteria for equitable subrogation were met and the doctrine should be applied. During the close of escrow on July 30, 2007, Financial Title disbursed the funds necessary to pay off the existing AHM and Compass liens, and WaMu's closing instructions conditioned its $6.6 million loan to Berrydane on Financial Title ensuring that WaMu's loan would be secured by a first lien. Therefore, WaMu paid those pre-existing debts to protect its interest in the Property. Moreover, it expected that it would have a priority lien position. *See generally Sourcecorp*, 229 Ariz. at 275,

¶ 21, 274 P.3d at 1209 (rejecting the necessity of an express or implied agreement that the party paying a mortgage will succeed to the position of the prior lienholder).

**¶31** Additionally, as the trial court found, Popple, the intervening lienholder, was not legally prejudiced because when she recorded the Popple DOT, that DOT was junior to the still-existing AHM and Compass liens. When WaMu stepped into the shoes of the prior lienholders, the position of the Popple DOT did not change. Although Appellants contend the position of the Popple DOT is changed if Chase is equitably subrogated because the Popple DOT will not move into the superior lien position, *Sourcecorp* makes clear that "preventing a junior lienholder from advancing in priority is an intended consequence of equitable subrogation." *Id.* at 276, ¶ 26, 274 P.3d at 1210 (citing *Lamb Excavation*, 208 Ariz. at 483, ¶ 18, 95 P.3d at 547 ("We fail to comprehend the nature of the perceived prejudice or inequity, as it appears the lienholders would remain in the *same* position they occupied before subrogation . . . ."); Restatement (Third) of Property: Mortgages ("Restatement") § 7.6 cmt. e (1997) ("The holders of . . . intervening interests can hardly complain [about subrogation]; their position is not materially prejudiced, but is simply unchanged.")). Consequently, the inability of the Popple DOT to "move up" in priority does not constitute legal prejudice to Popple precluding subrogation. Prejudice would mean Popple's position is made worse, not that her position remains the same.

**¶32** Moreover, if equitable subrogation is not applied, Popple would be unjustly enriched. Equitable subrogation is intended to avoid an unearned windfall for the intervening lien claimant at the expense of another entity. *See Id.* at 275, ¶¶ 23-24, 274 P.3d at 1209. Without equitable subrogation, the money provided by WaMu/Chase would pay off Popple's pre-August 2, 2007 liens, but Popple would reap the benefit of first priority security, resulting in an unearned windfall.

**¶33** Additionally, we find no evidence of "unclean hands" on the part of WaMu or Chase that would preclude the application of equitable subrogation. Although Appellants argue Chase was legally required to seek a judicial declaration of lien priority before the 2008 Sale of the WaMu DOT, we are unaware of any Arizona law imposing such a requirement, and Appellants point to none. *See generally Andreola v. Ariz. Bank*, 26 Ariz. App. 556, 559, 550 P.2d 110, 113 (1976) (recognizing that a major purpose of the trustee's sale statutes is "to provide relatively inexpensive and speedy foreclosure proceedings"); *cf. Pappas v. E. Sav. Bank, FSB*, 911 A.2d 1230, 1236 (D.C. 2006) ("[T]here is no rule or practice in our jurisdiction that a lien

holder forfeits a claim to priority of its lien under equitable principles if it forecloses without awaiting a judicial decree as to the priority of liens."); *G.E. Capital Mortg. Servs., Inc. v. Levinson*, 657 A.2d 1170, 1178 (Md. 1995) (concluding there was no need to litigate the right to equitable subrogation before advertising a sale).[15] Moreover, Chase gave Popple notice of the 2008 Sale and Chase's contention that it was in a first priority lien position. By paying off the AHS and Compass loans on the Property, Chase positioned itself to be equitably subrogated to a first priority lien position, a position we conclude it equitably occupied when it went to the trustee's sale of the WaMu DOT.[16] At the 2008 Sale, Chase lawfully acquired the Property by purchasing it with a credit bid of $4,010,000. Finally, by seeking a preliminary injunction of the 2009 Sale involving the Popple DOT, Chase tried to prevent LVIH and Popple from involving and taking money from a third party, MGM.

¶34        Even if we were to assume *arguendo* that Chase acted inequitably, the trial court did not err in concluding that "Chase's hands are pristine as compared to Popple's." Overwhelming evidence in the record, including Popple's own internally contradictory testimony, supports the trial court's conclusion that "Popple was on notice of the WaMu DOT" at the close of escrow.[17] The record further supports that, by failing to disclose

---

[15]        We note too that, just as Chase could (and perhaps may have been better advised to) have sought to clear up the issue of lien priority before rather than after the 2008 Sale, Popple and LVIH also could (and perhaps should) have done so. However, even after they were advised a dispute existed and a trustee's sale had been scheduled, neither Popple nor LVIH sought a court order to enjoin the sale and challenge its validity or establish the lien priority positions of the WaMu DOT and Popple DOT. *See generally* A.R.S. § 33-811(C) (stating that all persons to whom a trustee mails a notice of sale under a trust deed pursuant to A.R.S. § 33-809 shall waive all defenses and objections to the sale not raised in an action resulting in injunctive relief pursuant to Rule 65, Ariz. R. Civ. P.).

[16]        *Cf. In re Farnsworth*, 384 B.R. 842, 849-50 (Bankr. D. Ariz. 2008) (recognizing that, when an agreement exists in which parties have indicated an intent to charge or appropriate particular property as security for an obligation, courts usually order an equitable lien to relate back to the time of the agreement).

[17]        Because we conclude the trial court did not err in applying equitable subrogation to the WaMu DOT, we need not decide the parties' arguments regarding whether the trial court erred in also applying A.R.S. § 33-412(B)

her side deal with Berrydane, Popple caused WaMu to loan substantially more than the actual purchase price of the home. Although WaMu bears some responsibility for incurring greater liability than it should have, its culpability pales in comparison to that of Popple. *See Coleman*, 48 Ariz. at 341-42, 61 P.2d at 443. Neither before nor at the close of escrow did Popple fully disclose her side deal with Berrydane to Financial Title or WaMu. In the $3.275 million assignment to R&R, Popple did not disclose that Berrydane controlled R&R or that the $3.275 million was a kickback of her net purchase proceeds. Further, although Popple testified she informed the escrow agent at closing of the $1 million carryback loan, substantial evidence supports the trial court's conclusion that she did not disclose the information.[18] Instead, Popple directly benefitted from the Berrydane-Popple side deal and close of escrow by having her approximately

---

to determine the WaMu DOT was the senior lien on the Property. *See* A.R.S. § 33-412(B) ("Unrecorded instruments, as between the parties and their heirs, and as to all subsequent purchasers with notice thereof, or without valuable consideration, shall be valid and binding."). Nonetheless, we agree with the court's conclusion that Popple was on notice of the WaMu DOT. The record makes clear Popple had actual notice of the WaMu loan and at least inquiry (if not actual) notice of the WaMu DOT. *See Shalimar Ass'n v. D.O.C. Enters., Ltd.*, 142 Ariz. 36, 44, 688 P.2d 682, 690 (App. 1984) (recognizing that a person having actual notice of circumstances sufficient to put a prudent person on inquiry as to a particular fact is deemed to have notice of that fact if, by pursuing such inquiry, the person might have learned that fact); *see also Neal v. Hunt*, 112 Ariz. 307, 311, 541 P.2d 559, 563 (1975) ("Constructive and actual notice have the same effect." (citation omitted)).

[18]     We also note that a trial court is not bound to accept as true even the uncontroverted testimony of an interested party. *Hamilton v. Mun. Court*, 163 Ariz. 374, 377, 788 P.2d 107, 110 (App. 1989) (citing *Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 261, 735 P.2d 1373, 1384 (App. 1987)). In its "Conclusions of Law," the trial court included a finding that Popple's testimony was wholly not credible. To the extent the court's conclusion was simply a credibility determination, we generally defer to the trial court's determination unless clearly erroneous. *See W. Coach Corp. v. Kincheloe*, 24 Ariz. App. 55, 58, 535 P.2d 1059, 1062 (1975); *see also In re James P.*, 214 Ariz. 420, 425, ¶ 24, 153 P.3d 1049, 1054 (App. 2007) (recognizing the trial court is in the best position to assess the credibility of a witness). In any event, the record fully supports the court's finding.

$4 million debt on the Property paid in full, receiving approximately $1 million in cash, and receiving the Popple DOT for the carryback loan. Later, upon receipt of Chase's June 30, 2008 letter, Popple attempted to insulate herself from liability by assigning her interest in the Popple DOT to her corporation, LVIH. Finally, through the 2009 Sale, Popple (through LVIH) further entangled the situation by selling the Popple DOT to a third party (MGM) and receiving approximately $1 million from MGM in return.

¶35        Given that (1) WaMu paid the pre-existing debts owed by Popple to AHM and Compass to protect its interest in the Property (with the expectation that it would have a priority lien position); (2) Popple, the intervening lienholder, is not legally prejudiced by the application of equitable subrogation; (3) Popple would be unjustly enriched if the WaMu DOT was not equitably subrogated, and (4) no evidence of "unclean hands" on the part of WaMu or Chase exists (at least compared to Popple) that would preclude the application of equitable subrogation, we hold the trial court did not err in applying equitable subrogation to the WaMu DOT. To deny equitable subrogation in this case would give Popple a windfall and reward her unscrupulous conduct, a result contrary to *Sourcecorp* and the purpose of equitable subrogation under Arizona law. Accordingly, when WaMu paid off the AHM and Compass liens, WaMu held a first position lien on the Property by virtue of equitable subrogation, a position it continued to hold at the time of the 2008 Sale.

        II.    *Result of the 2008 Sale*

¶36        At the 2008 Sale, Chase purchased the Property as the foreclosing beneficiary with a credit bid of $4,010,000 and received a trustee's deed, which Chase recorded. With exceptions for liens, claims, or interests having a priority senior to the deed of trust, a trustee's deed conveys to the purchaser all interest in the subject property:

> The trustee's deed shall operate to convey to the purchaser the title, interest and claim of the trustee, the trustor, the beneficiary, their respective successors in interest and all persons claiming the trust property sold by or through them, including all interest or claim in the trust property acquired subsequent to the recording of the deed of trust and prior to delivery of the trustee's deed. *That conveyance shall be absolute without right of redemption and clear of all liens, claims or interests that have a priority subordinate to the deed of trust* and shall be subject to all liens, claims or interests that have a priority senior to the deed of trust.

A.R.S. § 33-811(E) (emphasis added).

¶**37**        Thus, as a result of the 2008 Sale, the trustee's deed operated to convey to Chase "the title, interest and claim" in the Property that WaMu/Chase held through its subrogated lien.[19]   A.R.S. § 33-811(E). Further, the conveyance was "absolute without right of redemption and clear of all liens, claims or interests that ha[d] a priority subordinate to the deed of trust." *Id.* Pursuant to A.R.S. § 33-811(E), the 2008 Sale extinguished the subordinate Popple DOT, and Chase was entitled to a judgment quieting title to the Property in favor of Chase and against LVIH, the successor to Popple.  None of the events that occurred thereafter could

---

[19]        Appellants argue Chase's equitable subrogation claim was eliminated by merger when Chase received the trustee's deed at the 2008 Sale.  *See generally Mid Kansas Fed. Sav. & Loan Ass'n v. Dynamic Dev. Corp.*, 167 Ariz. 122, 129, 804 P.2d 1310, 1317 (1991); *see also Cardon v. Cotton Lane Holdings, Inc.*, 173 Ariz. 203, 206, 841 P.2d 198, 201 (1992) (citing *Mid Kansas* for the proposition that "if [a] deed of trust holder purchases property at [a] trustee's sale, its interest in [the] deed of trust merges in the fee and [the] deed of trust no longer exists").  Appellants therefore suggest equitable subrogation was no longer available for Chase to assert before the trial court.   The doctrine of merger is, however, subject to equitable considerations. *See Mid Kansas*, 167 Ariz. at 129, 804 P.2d at 1317 ("However, even if a merger would otherwise occur at law, contrary intent or equitable considerations may preclude this result under appropriate circumstances." (citation omitted)); *cf. Pappas*, 911 A.2d at 1236 (rejecting the proposition that a lienholder who forecloses on a subordinate or unsubrogated lien forfeits its right to subrogation under a deed of trust (citing *Am. Century Mortg. Inv'rs v. Unionam. Mortg. & Equity Tr.*, 355 A.2d 563, 565 (D.C. 1976))).  We reject Appellants' suggestion because, as we have already concluded, the WaMu DOT was equitably subrogated to the first priority lien position *before* Chase went to the 2008 Sale.  The first priority lien position of the WaMu DOT could not be retroactively changed by later events, such as a merger of the lien into the fee after the 2008 Sale or the trial court's denial of Chase's application for injunctive relief.  (Moreover, even if Chase's first priority lien did merge with its fee at that time, such merger would not have the effect of "resurrecting" the Popple DOT that was extinguished by the plain terms of A.R.S. § 33-811(E).)

retroactively change the first lien priority of the WaMu DOT or resurrect the extinguished Popple DOT.[20]

¶38 Appellants argue that MGM was nonetheless entitled to judgment in its favor based on the principles stated in *BT Capital, LLC v. TD Service Company of Arizona*, 229 Ariz. 299, 275 P.3d 598 (2012). They maintain that, because Chase sought but failed to obtain injunctive relief before the 2009 Sale, Chase is precluded from challenging that sale. Chase counters that the 2009 Sale proceeded under an extinguished lien interest, and MGM cannot rely on the 2009 Sale and *BT Capital* to resurrect the extinguished Popple DOT and retroactively alter the lien priority because lien priority is not a defense or objection under A.R.S. § 33-811(C), but is instead governed by § 33-811(E), and "[a] trustee's sale does not and cannot determine lien priority." Further, Chase maintains that because MGM failed to timely raise its bona fide purchaser for value without notice defense, that defense was precluded, and MGM cannot rely on the statutory presumption of regularity of the sale; instead, MGM must step into the shoes of Popple and can have no greater rights than Popple, whose subordinate lien was extinguished by the 2008 Sale.

---

[20] Noting that, at the 2008 Sale, Chase submitted a credit bid of $4,010,000, an amount slightly higher than the $3,942,918.60 Financial Title disbursed to pay off the combined AHM and Compass DOTs at escrow, Appellants suggest an irregularity occurred in the sale and maintain "Chase is barred from asserting any equitable subrogation claim for a greater amount than that which it already has received." However, interest accrues on an equitably subrogated lien at the rate of the loan underlying the paid-off mortgage. *See Lamb Excavation*, 208 Ariz. at 483, ¶ 19, 95 P.3d at 547; Restatement § 7.6, cmt. e. ("Subrogation should be granted only to the extent of the debt balance that would have existed if the interest rate had been unchanged."). As previously noted, the amount of the paid-off senior liens, including interest, was "well above" the amount of Chase's credit bid. *See supra* note 10, at ¶ 15.

We also reject Appellants' suggestion of an irregularity in the 2008 Sale on the basis that Chase did not publicly announce it was claiming a first priority lien position. Nothing in A.R.S. § 33-808(C), which sets forth the content requirements for a trustee's notice of sale, requires an assertion of the priority status of the lien being foreclosed upon. Moreover, nothing in the record suggests the 2008 Sale was conducted in less than full compliance with all applicable non-judicial foreclosure statutes.

**¶39** Appellants' argument is precluded and their reliance on *BT Capital* is misplaced; as noted above, the 2008 Sale to Chase extinguished Popple's DOT. *See* A.R.S. § 33-811(E); *BT Capital*, 229 Ariz. at 301, ¶ 12, 275 P.3d at 600.[21]

### III. *The Trial Court's Evidentiary Rulings*

**¶40** Appellants argue the trial court erred in two evidentiary rulings: (1) precluding as untimely MGM's bona fide purchaser for value without notice defense, and (2) declining Appellants' request for the court to take judicial notice of when the lis pendens filed in connection with Chase's action against LVIH was indexed. *See supra* note 11, at ¶ 18.

**¶41** We review the trial court's rulings for an abuse of discretion. *See, e.g., Bryan v. Riddel*, 178 Ariz. 472, 477, 875 P.2d 131, 136 (1994) (reviewing rulings involving alleged discovery violations for an abuse of discretion); *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 404, ¶ 89, 276 P.3d 11, 38 (App. 2012) (reviewing a trial court's evidentiary rulings for an abuse of discretion); *Englert v. Carondelet Health Network*, 199 Ariz. 21, 25, ¶ 5, 13 P.3d 763, 767 (App. 2000) (reviewing for an abuse of discretion a trial court's decision to grant a new trial based on the court's finding that it should have precluded an affirmative defense not disclosed before trial).

**¶42** "A party is required to timely disclose its legal defenses and the factual bases for them . . . ." *Englert*, 199 Ariz. at 25, ¶ 6, 13 P.3d at 767 (citing Ariz. R. Civ. P. 26.1(a)). A failure to do so shall result in sanctions, including preclusion of the information at trial, absent specific extenuating circumstances. Ariz. R. Civ. P. 37(c)(1).

### A. *MGM's BFP Defense*

**¶43** In this case, as we have noted, the trial court precluded MGM's bona fide purchaser for value without notice defense on the basis of untimely disclosure, and therefore concluded that MGM stood "in Popple's shoes" with regard to the defenses it could bring. Accordingly,

---

21 In effect, in the 2009 Sale, LVIH foreclosed on an extinguished second position interest (the Popple DOT). MGM's purchase placed it in Popple's shoes, and MGM took only the same rights she had. Moreover, MGM could not show it was a bona fide purchaser for value without notice. *See, e.g., Davis v. Kleindienst*, 64 Ariz. 251, 257, 169 P.3d 78, 81-82 (1946). MGM did not timely raise that argument, and as we have recognized, was precluded from using it at trial.

the court concluded, "Evidence regarding notice and prejudice to MGM is not relevant and is precluded."

**¶44** We find no abuse of the trial court's discretion. In this case, MGM failed in its answer to assert as a defense that it was a bona fide purchaser for value without notice, and never filed a disclosure statement raising that defense throughout the ensuing litigation. Instead, MGM raised that defense for the first time in the parties' joint pretrial statement filed April 24, 2012. Chase objected and moved to preclude the defense as untimely, arguing Chase had not pursued any discovery on the issue because it had not been disclosed. During argument on the morning of the first scheduled day of trial, the court directly asked counsel for MGM where the defense had been disclosed. Counsel for MGM conceded that "we're not going to have a disclosure that says BFP bona fide purchaser." Given the extremely late disclosure of MGM's bona fide purchaser for value without notice defense and the potential prejudice to Chase at trial of litigating against a defense for which it had not prepared, the trial court did not abuse its discretion in precluding that defense.[22] Consequently, MGM stood in the shoes of Popple and LVIH, whose lien had been extinguished by the October 2008 trustee's sale.

---

[22] Moreover, even given the undeveloped state of the record, it appears unlikely MGM would have been able to establish a bona fide purchaser for value without notice defense had it disclosed such a defense. Shuster's deposition testimony, as well as his testimony before the court as part of MGM's offer of proof that it was a bona fide purchaser for value without notice, indicate he had been put on notice that problems existed with the Property's title. Shuster testified at his deposition that, after discovering the Property was listed for only $2.6 million and had a first lien of $1 million, he "thought, gosh, there's some problem here and I'm interested in pursuing it," but he did no further research on the problem he perceived. After learning a trustee's sale had been scheduled, he called the trustee to obtain a copy of the Trustee Sale Guarantee, but the trustee refused to provide him with one until the sale. At the sale, he learned from two attorneys that there was "a problem with the title," but he was willing to proceed with the sale if he could obtain title insurance, despite the fact that he had been advised "some type of problem" existed. *See, e.g.*, *Davis*, 64 Ariz. at 258-59, 169 P.2d at 83 ("Thus a purchaser who has brought to his attention circumstances which should have put him on inquiry which if pursued with due diligence would have led to knowledge of an adverse interest in the property, is not a bona fide purchaser." (citation omitted)).

*B. Rejection of Judicial Notice of Indexing of Lis Pendens*

**¶45**        At trial, the lis pendens filed in connection with Chase's action against LVIH was initially stipulated into evidence and included as an exhibit in the advisory jurors' notebooks. MGM asked the court to take judicial notice of when the lis pendens was indexed, *see* Ariz. R. Evid. 201(c)(2), in furtherance of MGM's argument that it did not have notice of any WaMu/Chase lien priority. The trial court took the matter under advisement, and before the court ruled on the motion, counsel for MGM began to question the home lending research officer for Chase about the lis pendens. The court sustained Chase's objection to the questioning on the basis of relevance and subsequently denied the motion for judicial notice, concluding that notice to MGM was irrelevant due to the court's earlier ruling precluding MGM's untimely-disclosed bona fide purchaser for value without notice defense. At the same time, Chase agreed to withdraw the lis pendens from evidence.

**¶46**        MGM argues the trial court erred in rejecting the motion to take judicial notice of the indexing of the lis pendens. Even assuming without deciding that MGM is correct, however, MGM's argument is a non sequitur. The lis pendens was withdrawn from evidence, clearly did not affect the advisory jury's verdict, and did not form any part of the basis for the trial court's ruling in Chase's favor. Moreover, even if MGM had a legitimate bona fide purchaser for value without notice defense—which the later indexing of the lis pendens was intended to support—the court did not commit reversible error in denying Appellants' motion to take judicial notice of information about a document withdrawn from evidence, especially given Shuster's testimony (given outside the presence of the jury as part of MGM's offer of proof regarding its bona fide purchaser for value defense) that he never looked to see if a lis pendens had been filed. Further, we disagree with MGM's argument that the date of indexing of the lis pendens establishes a lack of equity on the part of Chase such as to constitute error requiring reversal.

*IV.      Attorneys' Fees on Appeal*

**¶47**        The parties each request an award of costs and attorneys' fees on appeal. MGM cites A.R.S. § 33-420, LVIH cites A.R.S. §§ 12-341.01 and 33-420, and Chase cites A.R.S. § 12-1103(B).[23]

---

[23]        Each of the parties also cites Arizona Rule of Civil Appellate Procedure ("ARCAP") 21. However, ARCAP 21 is a procedural rule that

**¶48**　　　　"The exclusive basis for attorneys' fees for quiet title actions lies in A.R.S. § 12-1103," which allows for an award of attorneys' fees on appeal. *Lewis v. Pleasant Country, Ltd.*, 173 Ariz. 186, 195, 840 P.2d 1051, 1060 (App. 1992) (citation omitted).　Chase is the prevailing party, and fulfilled the requirements of § 12-1103(B) when, on December 3, 2008, Chase mailed a letter to counsel for LVIH with a quitclaim deed to the Property and $5.00, and on March 17, 2009, tendered $5.00 and a quitclaim deed to the Property to MGM.　Neither LVIH nor MGM executed and returned the quitclaim deed.　Therefore, in the exercise of our discretion, we grant Chase its taxable costs and attorneys' fees, in an amount to be determined upon compliance with ARCAP 21.

## CONCLUSION

**¶49**　　　　The trial court's judgment is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: AA

---

does not provide a substantive basis for an award of attorneys' fees. *See Tilley v. Delci*, 220 Ariz. 233, 239, ¶ 19, 204 P.3d 1082, 1088 (App. 2009) (citation omitted).